**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Eric L. Zagar (Bar No. 250519)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Counsel for Plaintiff City of Hollywood*
*Firefighters' Pension System*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| CITY OF HOLLYWOOD FIREFIGHTERS' PENSION SYSTEM, | Case No.: 4:23-cv-02445-JST |
| Plaintiff, | |
| v. | |
| STEVEN D. BLACK, MARK A. CHANCY, THEODORE F. CRAVER, JR., MARIA R. MORRIS, RICHARD B. PAYNE, JR, RONALD L. SARGENT, CHARLES W. SCHARF, AND SUZANNE M. VAUTRINOT, | **VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Defendants, | **JURY TRIAL DEMANDED** |
| and | |
| WELLS FARGO & COMPANY, | |
| Nominal Defendant. | |

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1

# **TABLE OF CONTENTS**

2
**Page**

3  I.  NATURE OF THE ACTION ................................................................. 1

4  II.  PARTIES .................................................................................. 8

5  III.  JURISDICTION ........................................................................ 10

6  IV.  FACTUAL BACKGROUND ............................................................ 10

7      A.  Overview Of The Company And The Regulatory Environment To Which It Is Subject ........................................................................ 10

8

9      B.  Wells Fargo's Unique Operating Culture ................................. 12

    C.  Wells Fargo's Siloed Operating Model Created An Environment That
10          Resulted In Some Of The Most Egregious Behavior Of Any Major American Bank ................................................................................. 13

11

12      D.  Wells Fargo Agreed To Multiple Consent Orders With Its Regulators Between 2016 And 2018 ...................................................... 17

13          1.  The 2016 CFPB Order ................................................ 18

14          2.  The 2016 OCC Order ................................................. 18

15          3.  The 2018 FRB Order ................................................. 19

16          4.  The 2018 OCC Order ................................................. 21

17          5.  The 2018 CFPB Order ................................................ 24

18          6.  The 2018 SEC Order ................................................. 24

19      E.  Additional Compliance Deficiencies, Regulatory Penalties, and Lawsuit Settlements ....................................................................... 25

20

21      F.  The Board Knowingly and Deliberately Failed To Oversee and Ensure The Company's Compliance With The Consent Orders ............................. 29

22          1.  Throughout 2018 and 2019, The Board And Management Focused On Lifting The FRB's Asset Cap And Improving Earnings Rather
23              Than Complying With The Consent Orders ........................... 29

24          2.  The Board Failed To Hold Management Accountable For Wells Fargo's Failure To Comply With The Regulators' Clearly Expressed
25              Compliance Requirements ............................................ 32

26          3.  The Board's And Management's Myopic Focus On The Asset Cap And Earnings Resulted In Failure To Comply With The Consent
27              Orders' Requirements ................................................ 36

28

4.    Wells Fargo Settles Potential Criminal Charges With The SEC And Department Of Justice By Agreeing To Pay $3 Billion ................................ 43

5.    In March 2020, The House Financial Services Committee Releases Two Damning Reports About Wells Fargo's Noncompliance With Existing Consent Orders ................................ 44

6.    Even After Being Excoriated By The Congressional Reports, Wells Fargo's Compliance Shows Little Improvement ................................ 46

7.    Wells Fargo's Board Consciously Disregards A New CFPB Investigation That Begins In 2021 ................................ 48

G.    Wells Fargo's Continued Regulatory Failures Cause Two New Consent Orders To Be Issued By The OCC, Including A Fine Of $250 Million .................. 51

H.    The CFPB Imposes A Massive $3.7 Billion Fine And Restitution Requirement Against Wells Fargo, The Largest In The CFPB's History ................ 52

I.    The Wells Fargo Board Consciously Disregards The Massive $3.7 Billion Fine And Restitution Requirement ................................ 56

J.    Wells Fargo Agrees to Pay $1 Billion to Settle Class Action Over Compliance with the OCC Consent Order ................................ 58

V.    DEMAND IS FUTILE ................................ 58

VI.    PRAYER FOR RELIEF ................................ 60

VII.    JURY DEMAND ................................ 60

Plaintiff City of Hollywood Firefighters' Pension System ("Plaintiff"), by and through the undersigned attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against certain directors of Wells Fargo & Company ("Wells Fargo" or "the Company") for breaches of fiduciary duty in connection with their failure to comply with federal law, including explicit regulatory requirements established by federal regulators in multiple consent orders since 2018, which resulted in the imposition of massive fines and the entry of additional consent orders in 2021 and 2022. Except for the allegations specifically pertaining to Plaintiff, which are based upon Plaintiff's personal knowledge, the allegations of the Complaint are based upon the investigation conducted by Plaintiff's counsel, which included, among other things, a review of filings made with the U.S. Securities and Exchange Commission ("SEC"); review of documents provided by Wells Fargo in connection with a books-and-records demand pursuant to 8 *Del. C.* § 220; rulings and materials submitted to or entered by the Office of the Comptroller of the Currency ("OCC"), the Consumer Financial Protection Bureau ("CFPB"), and the Board of Governors of the Federal Reserve System ("Federal Reserve" or "FRB"); press releases; news reports; and other publicly available documents. Plaintiff's counsel's investigation also included review of two reports from the House Financial Services Committee issued on March 5, 2020: a report by the Committee Majority Staff, *The Real Wells Fargo: Board & Management Failures, Consumer Abuses, and Ineffective Regulatory Oversight* (the "Majority Report") and a report by the Republican Committee Staff, *Uniquely Flawed: An Overview of Failures and Structural Deficiencies at Wells Fargo* ("Republican Report") (together, the "House Reports").

I.    **NATURE OF THE ACTION**

1.    Wells Fargo is one of the largest financial services companies in America, and its wholly-owned subsidiary Wells Fargo Bank N.A. (the "Bank" or "WF Bank"), is one of the four largest U.S. banks. As large financial institutions, Wells Fargo and WF Bank, as well as their officers and directors, are subject to extensive federal and state regulations designed to protect consumers and the U.S. financial system and, in consequence, they are required to establish and maintain procedures reasonably designed to ensure and monitor regulatory compliance. The OCC, CFPB, and the Federal

Reserve are the primary regulatory agencies responsible for promulgating rules and regulations, developing guidance, and ensuring compliance by big banks, including WF Bank.

2.      Since at least 2002, Wells Fargo and WF Bank, with the knowledge and approval or acquiescence of their directors, routinely and persistently engaged in illegal, fraudulent conduct that harmed millions of Wells Fargo's customers. This egregious and repeated illegal conduct resulted in multiple investigations by Wells Fargo's regulators and the entry by the OCC, CFPB, and the Federal Reserve of multiple consent decrees against Wells Fargo between 2016 and 2018. Pursuant to these consent decrees, Wells Fargo paid billions of dollars in fines and restitution, was subject to regulatory restrictions that cost it billions of dollars more in lost earnings, and was subjected by regulators to enhanced compliance obligations that cost the Company tens or hundreds of millions in additional costs. These regulatory orders include:

- Consent orders against WF Bank entered on September 6, 2016 by the OCC ("2016 OCC Order")[1] and on September 8, 2016 by the CFPB (the "2016 CFPB Order")[2] arising from the Bank's illegal practice of opening banking and credit card accounts without customer authorization or knowledge. The consent orders required the Board of Directors of Wells Fargo (the "Board") to review and approve certain plans for submission to the regulators, including a Comprehensive Action Plan under the 2016 OCC Order and a Compliance Plan under the 2016 CFPB Order.

- A cease and desist order against Wells Fargo entered on February 2, 2018 (the "2018 FRB Order"),[3] by the Federal Reserve for its failure to implement appropriate risk management compliance programs. Among other penalties, the 2018 FRB Order restricted Wells Fargo to a maximum of $1.95 trillion in total assets (the "Asset Cap"). The Federal Reserve also ordered Wells Fargo to submit written plans to enhance the oversight effectiveness of the Board and to improve compliance and operational risk management.

- Coordinated consent orders against WF Bank entered on April 20, 2018 by the OCC (the "2018 OCC Order")[4] and the CFPB ("2018 CFPB Order").[5] The Bank

---

[1] *Wells Fargo Bank, N.A.*, Department of the Treasury Comptroller of the Currency, #2016-077 (Sept. 6, 2016).
[2] *Wells Fargo Bank, N.A.*, Consumer Financial Protection Bureau, No. 2016-CFPB-0015 (Sept. 8, 2016) (the 2016 CFPB Order and the 2016 OCC Order, collectively are referred to herein as the "2016 Consent Orders").
[3] *Wells Fargo & Co.*, Order to Cease and Desist Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, Board of Governors of the Federal Reserve System, Docket No. 18-007-B-HC (Feb. 2, 2018).
[4] *Wells Fargo Bank, N.A.*, Department of the Treasury Comptroller of the Currency, #2018-025 (Apr. 20, 2018).
[5] *Wells Fargo Bank, N.A.*, Bureau of Consumer Financial Protection, No. 2018-BCFP-0001 (Apr. 20, 2018) (the 2018 CFPB Order, together with the 2018 FRB Order and 2018 OCC Order, collectively

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

was ordered to pay a total of **$1 billion in fines**, in addition to remediation payments to harmed consumers, and to submit various plans to the regulators, including a Compliance Risk Management Plan ("CRMP"). The orders explicitly required the Board to "ensure that the Bank submits the plans, programs, policies, and procedures" and to "ensure that the Bank has processes, personnel, and control systems to ensure implementation of and adherence to the plans, programs, policies, and procedures required."[6]

3.    Over at least the last five to six years, Wells Fargo and WF Bank have consistently failed to comply with the requirements of the Consent Orders because the Board has knowingly and deliberately ignored its duties to oversee management's compliance efforts and ensure compliance with the Consent Orders and applicable federal law. Significantly, even though Defendants, as members of the Board during some or all of the period from 2018 to the present, were well aware that the Company was making no real progress in complying with the Consent Orders, the Board undertook little, if any, action to ensure that Wells Fargo and WF Bank complied with their legal and regulatory responsibilities, and knowingly caused or allowed Wells Fargo and WF Bank to commit further violations of federal law.

4.    The Board was presented with and ignored numerous "red flags" warning that the Bank's compliance efforts were insufficient and could invite further fines and sanctions from regulators. Beginning in the latter part of 2018, and continuing at least through the end of 2022, the Board received consistent warnings from its regulators that the Company's written plans, which had been reviewed and/or approved by the Board, were incomplete and ineffective, that management was too focused on growth and removing the Asset Cap, and that the Board needed to improve its oversight and hold management accountable. For example:

- On November 21, 2018, the OCC rejected Wells Fargo's revised submission of written plans as "not adequately supported."[7]

- On January 24, 2019, the Federal Reserve met with Wells Fargo leadership and expressed concern that the Company remained too "focused on lifting the asset cap" and was inappropriately shaping remediation plans around that.[8]

- On February 15, 2019, the OCC staff emailed Wells Fargo Board Chairperson Elisabeth Duke ("Duke") to express their "deep[] concern[] about the continuing

are referred to herein as the "2018 Consent Orders"). The 2016 Consent Orders and 2018 Consent Orders will be collectively referred to as the "Consent Orders."
[6] 2018 OCC Order at 22; 2018 CFPB Order at 17.
[7] Majority Report at 62.
[8] Republican Report at 25; Majority Report at 52.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

-3-

(and in some cases worsening) problems" regarding the Company's compliance with the Consent Orders.[9]  Particularly, the OCC was concerned with the "large number of extension requests, missed expected completion dates that are not communicated in a timely manner, failed audit validations, and extensions of Consent Order deadlines."[10]

5.      Despite the regulators' concerns about Wells Fargo CEO Tim Sloan ("Sloan") and management's ability to comply with the Consent Orders, "the Board, headed by Betsy Duke . . . made clear their *emphatic support for* Tim."[11]  On March 13, 2019, Wells Fargo announced a $2 million bonus for Sloan.  Regulators reacted to the bonus and Sloan's testimony with outrage[12] and continued to warn the Board about its inadequate management oversight.  For example:

- On March 4, 2019, the OCC reported that Wells Fargo's "management and Board oversight remain inadequate" and that "overall, progress is very slow."[13]  The OCC warned that "[t]he Board and executive management must demonstrate the willingness and ability to implement and maintain effective corporate governance and risk management programs that span the enterprise."[14]

- On March 11, 2019, the Federal Reserve sent a letter to Duke regarding Wells Fargo's inadequate plan submission dated October 31, 2018.[15]  The letter identified fundamental gaps in the plan and stated that "[a] third failure to submit acceptable plans could cause the [Federal Reserve] to consider additional actions."[16]

- On March 12, 2019, the OCC released a written statement openly criticizing Wells Fargo's performance under the Consent Orders.[17]  The OCC wrote that it "continue[s] to be disappointed with [Wells Fargo's] performance under our consent orders and its inability to execute effective corporate governance and a successful risk management program.  We expect National Banks to treat their customers fairly, operate in a safe and sound manner, and follow the rules of law."[18]

- On March 13, 2019, the OCC met with the Board and "specifically raised concerns about Sloan's commitment to accountability and progress on remediation."[19]  The OCC stated its concern "that the Board has not held management appropriately

---

[9] Majority Report at 64.
[10] *Id.*
[11] Republican Report at 85-86.
[12] Majority Report at 7.
[13] *Id.* at 40-41.
[14] *Id.* at 41.
[15] *Id.* at 38.
[16] *Id.* at 39.
[17] Rachel Louise Ensign and Andrew Ackerman, *Regulator Slams Wells Fargo After CEO Testifies to Congress*, Wall Street Journal (Mar. 12, 2019, 4:58 PM), https://www.wsj.com/articles/wells-fargo-ceo-faces-aggressive-questions-from-congress-11552408186.
[18] *Id.*
[19] Republican Report at 27.

accountable and driven more change," noting that "efforts to hold people accountable are too slow and often questionable in approach."[20]

6.    Sloan finally resigned as CEO on March 28, 2019,[21] and ultimately was replaced by Defendant Charles W. Scharf ("Scharf"), but throughout the rest of 2019, the regulators continued to warn Wells Fargo about its unsatisfactory plans.  For example:

- On July 16, 2019, the OCC reported that it "remains concerned about the overarching vision around remediation," and noted that "[t]he OCC has not observed a drive towards greater consistency and a large number of plans had to be resubmitted multiple times."[22]

- On September 9, 2019, the OCC "reiterated the message the OCC had presented to the board and senior management in July of that year: 'When you are unable to meet your commitments, understand why and address the root cause.  That includes holding people accountable.'"[23]

- On December 19, 2019, the OCC reported that the Bank's progress on the Consent Orders "continues to lag expectations."[24]  At that time, the Bank was estimating full compliance with the 2016 OCC Order by September 30, 2021 and had not yet "provided an estimated date for when it will be fully compliant with the 2018 OCC [O]rder."[25]

7.    During this time frame, the Board and the Regulatory Compliance Oversight Committee ("RCOC"), a committee of the Bank's Board of Directors, also received repeated warnings from the Company's internal auditors that Wells Fargo and WF Bank were not adequately complying with the Consent Orders and other federal laws.  For example, monthly meeting minutes and audit reports show that Wells Fargo Audit Services ("WFAS") repeatedly reported to the RCOC that certain consent order compliance efforts were rated "red" (or "off-track") or "yellow" (or "at-risk"), and thus were in danger of not being completed successfully and on time.

8.    Even after Scharf became CEO in October 2019, Wells Fargo continued to fail to meet its obligations under federal law, *e.g.*, to the OCC, FRB and CFPB.  For example:

- On November 15, 2019, WFAS again warned the Board that Wells Fargo was "not on track to meet regulator expectations."  The status of Wells Fargo's Compliance Risk Management Program was rated "red" due to the "high number of milestones

[20] Majority Report at 59.
[21] Imani Moise, David Henry, *Wells Fargo CEO Tim Sloan steps down*, Reuters (Mar. 28, 2019, 4:20 PM), https://www.reuters.com/article/us-wells-fargo-ceo/wells-fargo-ceo-tim-sloan-steps-down-idUSKCN1R92MJ.
[22] Majority Report at 64.
[23] *Id.* at 60.
[24] *Id.* at 65.
[25] *Id.*

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
-5-

that are currently off track."[26]  Of 55 milestones to be validated by Wells Fargo's internal auditors, 29 were off track, with only 15 others fully validated and ready for regulator review and 10 others on-track.[27]

- On December 13, 2019, the Board was informed that plans remained off-track "due to missed deadlines and action plan and narrative quality."

- On January 24, 2020, Wells Fargo's Internal Audit Division ("Internal Audit," formerly WFAS) again reported to the Board that the Company was "off track" in its compliance with the 2018 Consent Orders, with concerns that the Company's FRB submission would not be ready in time and that a "high number of milestones" under the OCC and CFPB orders remained off-track.

- On January 27 and/or 28, 2020, Wells Fargo's Chief Operating Officer Scott Powell reported to the Board that the Company's "regulatory issues are symptoms of core issues that need to be addressed by implementing the Company's risk management framework and operating the Company differently and in alignment with heightened regulatory standards."

- As of February 20, 2020, the Board was informed that the Bank's efforts remained "off track," according to Internal Audit.

9.      On March 5, 2020, the House Reports laid bare the Board's failures.  The Republican Report found that "the Board continued to support the company's management despite overwhelming evidence that the consent order compliance program was inadequate."[28]  The Majority Report found that the Board "failed to ensure management could competently address the Company's risk management deficiencies," "prioritized financial and other considerations above fixing the issues identified by regulators," and "did not hold senior management accountable for repeatedly failing to meet regulators' expectations."[29]

10.      In the wake of the House Reports, Duke and James H. Quigley ("Quigley") resigned from their Board positions.  Nevertheless, the Company continued to fail in its poorly overseen efforts to comply with the Consent Orders. The Board continued to repeatedly receive red flags that Wells Fargo's compliance efforts were "off track" or "at risk"—but the Board ignored those warnings and failed to submit satisfactory compliance plans to the regulators or otherwise prevent and correct the Company's continuing violations of federal law.  For example:

- On April 23, 2020, Internal Audit reported to the Board that the Company's compliance efforts remained off-track.  Internal Audit noted that "consistently

---

[26] *Id.* at 9516.
[27] *Id.*
[28] Republican Report at 11 (Finding #12).
[29] Majority Report at 4-5.

missed deadlines and strategic changes have impeded progress" under the 2018 FRB Order, while 14 "milestones" under the OCC and CFPB orders were either "at risk" or "off track."

- On June 22 and 23, 2020, the Board convened for its regularly scheduled meetings. Management informed the Board of "Internal Audit's rejection of certain compliance plan milestones" and the "high number of outstanding remediations."

- On December 11, 2020, Internal Audit reported to the Board that the compliance with the 2018 OCC Order remained off-track. That remained the case in March 2021, when Internal Audit also rated the Company's compliance risk management as "weak" overall.

- In April 2021, Wells Fargo's Internal Audit department informed the relevant Board committees that compliance with the Consent Orders was not "on track" and that compliance plans likely would not be completed until the end of 2024.

- In June 2021, the full Board was briefed on new investigative demands from the CFPB regarding misconduct in the Company's automobile and mortgage-lending businesses, as well as the deposit account division.

- In August 2021, the Risk Committee was informed that remediation associated with the Company's retail sales practices had been changed to "off track" due to the identification of additional customers impacted by the misconduct.

11.     Despite the consistent warning signs that Wells Fargo and its new leadership were failing to comply with the Company's regulatory obligations under the Consent Orders and with other federal laws, the Board continued in its failure to hold management accountable. As a result, the OCC and CFPB imposed new orders that imposed historically large fines and reimbursement obligations on Wells Fargo, and Wells Fargo continues to operate under the Asset Cap imposed by the FRB more than six years ago.

12.     On September 9, 2021, the OCC issued two new consent orders[30] against WF Bank to address "the [B]ank's unsafe or unsound practices related to deficiencies in its home lending loss mitigation program and violations of the [2018 OCC Order]."[31] The OCC assessed WF Bank with a civil penalty of **$250 million** and ordered the Bank to "take broad and comprehensive corrective actions to improve the execution, risk management, and oversight of the bank's loss mitigation

---

[30] *Wells Fargo Bank, N.A.*, Department of the Treasury Office of the Comptroller of the Currency, #2021-035 (Sept. 9, 2021) ("2021 OCC Order #1) and *Wells Fargo Bank, N.A.*, Department of the Treasury Office of the Comptroller of the Currency, #2021-036 (Sept. 9, 2021) ("2021 OCC Order #2") and together with the 2021 OCC Order #1, the "2021 OCC Orders").
[31] News Release 2021-95, OCC, *OCC Assesses $250 Million Civil Money Penalty, Issues Cease and Desist Order Against Wells Fargo* (Sept. 9, 2021), https://www.ots.treas.gov/news-issuances/news-releases/2021/nr-occ-2021-95.html.

1  program."[32]  The orders also "restrict[] the bank . . . from acquiring certain third-party residential

2  mortgage servicing and requires the bank to ensure that borrowers are not transferred out of the bank's

3  loan servicing portfolio until remediation is provided."[33]

4       13.     On December 20, 2022, the CFPB issued a new consent order[34] requiring Wells Fargo

5  to pay a historically large *$1.7 billion* civil penalty for multiple legal violations and *$2 billion* in

6  restitution to harmed customers.  The CFPB found that Wells Fargo "unlawfully repossessed vehicles

7  and bungled borrower accounts," "improperly denied mortgage modifications," "illegally charged

8  surprise overdraft fees," and "unlawfully froze customer accounts and misrepresented fee waivers,"[35]

9  and that much of this misconduct occurred through 2022, *i.e.*, well after Wells Fargo and the Bank

10 were already subject to multiple Consent Orders and other legal and regulatory penalties for previous

11 violations of federal law.  Shortly after the CFPB issued the order, Wells Fargo announced it would

12 dramatically shrink its home lending business.[36]

13      14.     The Board's knowing and deliberate failure to fulfill its oversight and legal regulatory

14 compliance responsibilities in the face of numerous red flags renders each of the Defendants liable

15 for breaches of their duty of loyalty to the Company and for serious harm to Wells Fargo and its

16 shareholders.

17 **II.**    **PARTIES**

18      15.     Plaintiff is a shareholder of nominal defendant Wells Fargo and has owned Wells

19 Fargo stock continuously since December 24, 2012.  Plaintiff is a citizen of Florida.

20      16.     Nominal Defendant Wells Fargo is a Delaware corporation with its principal executive

21 offices located in San Francisco, and thus is a citizen of Delaware and California.

---

[32] *Id.*

[33] *Id.*

[34] *Wells Fargo Bank, N.A.*, Consumer Financial Protection Bureau, 2022-CFPB-0011 (Dec. 20, 2022) (the "2022 CFPB Order").

[35] Press Release, CFPB, *CFPB Orders Wells Fargo to Pay $3.7 Billion for Widespread Mismanagement of Auto Loans, Mortgages, and Deposit Accounts*, (Dec. 20, 2022).

[36] *Wells Fargo to shrink mortgage business, exit correspondent lending*, Reuters (Jan. 10, 2023, 6:14 PM), https://www.reuters.com/business/finance/wells-fargo-reduce-mortgage-servicing-exit-correspondent-business-2023-01-10/.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

17.    Defendant Steven D. Black ("Black") has been a Director of Wells Fargo since April 2020 and is the Chair of the Finance Committee.  Black is also a member of the Human Resources Committee.  Black is a citizen of Utah.

18.    Defendant Mark A. Chancy ("Chancy") has been a Director of Wells Fargo and a Director of WF Bank since August 2020 and is a member of the Audit Committee and the Finance Committee of the Wells Fargo Board.  Chancy is a citizen of Georgia.

19.    Defendant Theodore F. Craver, Jr. ("Craver") has been a Director of Wells Fargo and a Director of WF Bank since January 2018 and is the Chair of the Audit Committee of the Wells Fargo Board.  Craver is also a member of the Finance Committee of the Wells Fargo Board and a member of the Governance & Nominating Committee of the Wells Fargo Board.  Craver is a citizen of California.

20.    Defendant Maria R. Morris ("Morris") has been a Director of Wells Fargo and a Director of WF Bank since January 2018 and is the Chair of the Risk Committee of the Wells Fargo Board.  Morris is also a member of the Human Resources Committee of the Wells Fargo Board.  Morris is a citizen of New York.

21.    Defendant Richard B. Payne, Jr. ("Payne") has been a Director of Wells Fargo since October 2019 and a Director of WF Bank since 2020 and is a member of the Risk Committee of the Wells Fargo Board and the Chair of the Credit Subcommittee of the Wells Fargo Board.  Payne is a citizen of North Carolina.

22.    Defendant Ronald L. Sargent ("Sargent") has been a Director of Wells Fargo since February 2017 and is the Chair of the Human Resources Committee.  He is also a member of the Audit Committee and a member of the Governance & Nominating Committee.  Sargent is a citizen of Ohio.

23.    Defendant Charles W. Scharf ("Scharf") has been the CEO and President of Wells Fargo and WF Bank and a Director of Wells Fargo and WF Bank since October 2019.  Scharf is a citizen of New York.

24.     Defendant Suzanne M. Vautrinot ("Vautrinot") has been a Director of Wells Fargo since February 2015 and is a member of the Corporate Responsibility Committee and a member of the Risk Committee.  Vautrinot is a citizen of Colorado.

25.     Collectively, defendants Black, Chancy, Craver, Morris, Payne, Sargent, Scharf, and Vautrinot are referred to herein as the "Individual Defendants."

## III.  JURISDICTION

26.     This action arises under the laws of the State of Delaware because it pertains to breaches of fiduciary duty by directors of a corporation incorporated in Delaware.

27.     The United States District Court for the Northern District of California has subject matter jurisdiction to hear this matter under 28 U.S.C. § 1331 because this action states a federal question and under 28 U.S.C. § 1332 because all parties are citizens of different States and the amount in controversy exceeds $75,000.

28.     This Court has *in personam* jurisdiction of each Individual Defendant herein, as (i) Wells Fargo's principal place of business is within the Northern District of California, and (ii) each Individual Defendant was a director of Wells Fargo and has adequate minimum contacts with this District.

29.     Divisional Assignment: This action should be assigned to Oakland or San Francisco Division of this Court under Local Rule 3-2(d), as the Company is headquartered in San Francisco County, California and substantial portion of the transactions and conduct giving rise to the claims in this action occurred in the County of San Francisco.

## IV.  FACTUAL BACKGROUND

### A.  Overview Of The Company And The Regulatory Environment To Which It Is Subject

30.     Wells Fargo is a registered bank holding company that is incorporated in Delaware and headquartered in San Francisco, California.  It was founded on March 18, 1852, and, through internal growth and a variety of mergers and acquisitions, including a merger with Wachovia Corporation in 2008, has grown into one of the largest financial institutions in the U.S.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
-10-

31.     Wells Fargo ranked No. 41 on Fortune's 2022 rankings of America's largest corporations and, as of March 2023, had a market capitalization of nearly $150 billion. Its revenue in 2022 exceeded $74 billion. Wells Fargo consistently ranks as one of the largest employers in the U.S. It has nearly 270,000 employees, operating out of more than 7,000 locations.

32.     Wells Fargo wholly owns and controls WF Bank, headquartered in Sioux Falls, South Dakota. WF Bank is the fourth largest bank in the U.S by total assets. Together with JPMorgan Chase, Bank of America, and Citigroup, WF Bank is one of the "Big Four Banks" of the United States, with approximately $1.9 trillion in assets as of the end of 2022.

33.     Wells Fargo has one of the largest consumer banking footprints in the country and is consistently among the three largest mortgage lenders in the United States. In many years, Wells Fargo issues one-third of all U.S. mortgages. It also is among the largest lenders providing auto loans and other types of consumer lending. Overall, Wells Fargo provides some type of financial services to nearly one-third of U.S. households.

34.     As a major bank holding company and national bank, Wells Fargo and WF Bank are subject to extensive federal and state regulations. Historically, the primary federal agencies with responsibility for Wells Fargo and WF Bank were the OCC and the Federal Reserve. Wells Fargo is also subject to regulation by the SEC, which oversees its compliance with federal securities laws and the SEC's corporate governance rules. Further, as a result of the 2008-2009 financial crisis, Congress created the CFPB and provided it with authority to review and address consumer abuses in the banking industry, including WF Bank, and oversee the risks associated with banks' consumer-related activities.

35.     The federal regulators, along with their state counterparts, have a broad set of supervisory, enforcement and other authorities to monitor banks and take corrective action when banks break the law. In extreme cases, the regulators can bring litigation or require the entry of consent orders pursuant to which they may impose fines, restitution for wrongful conduct, and a wide variety of restrictions and/or affirmative requirements on the activities of banks subject to their jurisdiction. The multiple regulatory regimes with which Wells Fargo and WF Bank must comply

are intended to provide oversight over their compliance with applicable laws and management of the risks associated with their activities.

36.    Wells Fargo and WF Bank are subject to numerous legal requirements governing WF Bank's interactions with its customers, including Section 5 of the Federal Trade Commission Act ("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce;" Section 39 of the Federal Deposit Insurance Act ("FDIA"), which requires banks to comply with "safety and soundness standards" as established by the OCC; and the Consumer Financial Protection Act of 2010 ("CFPA"), which prohibits "unfair, deceptive, or abusive acts and practices" and empowers the CFPB to promulgate and enforce rules and regulations thereunder. As set forth below, the federal regulators have, since 2016, engaged in multiple investigations of Wells Fargo and WF Bank that have resulted in Consent Orders to remedy the most egregious conduct toward bank customers by any major U.S. bank in modern times.

**B.    Wells Fargo's Unique Operating Culture**

37.    Over the last decade, Wells Fargo's repeated and continuous violations of applicable laws have resulted in scandal after scandal, costing the Company billions in fines, penalties, and remediation payments so far. Since 2016, Wells Fargo has been subject to regulatory actions addressing the Company's "sales practices scandal," force-placed auto insurance, undue fines against mortgage customers, and more.[37] These scandals have damaged Wells Fargo's reputation and goodwill, in addition to the actual and potential liability stemming from the legal violations.

38.    In the wake of the scandals that rocked Wells Fargo beginning in 2016, the Wells Fargo Board commenced a third-party investigation into the causes of its wide-spread problems. In April 2017, the Board released the results of the investigation, which sought to uncover the "root causes of improper sales practices at the Company." The report concluded that, from the late 1990s, Wells Fargo and WF Bank operated in a different manner than many major U.S. financial institutions. Unlike the rest of the industry, Wells Fargo operated on a decentralized model that it instituted as a result of its 1998 merger with Norwest Corporation. Since at least the time of that merger, Wells

---

[37] Republican Report at 12.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
-12-

Fargo operated under a fragmented model that relied on "strong deference" to the leaders of the company's siloed business lines. A commonplace phrase within the company was "run it like you own it." As a result, Wells Fargo's lines of business traditionally had not only the ability to determine their own business activities, but also to independently operate their own staff and control functions, such as Risk and Human Resources. Under Wells Fargo's decentralized structure, risk officers reported to individual business line leaders, which positioned managers to choose between risk management and their bottom lines.

### C. Wells Fargo's Siloed Operating Model Created An Environment That Resulted In Some Of The Most Egregious Behavior Of Any Major American Bank

39. In the wake of the financial crisis, Wells Fargo was viewed by many "as one of the best banking franchises in the country." Wells Fargo's perceived core strength—retail banking—and reputation for responsible lending established the company as one of "the darlings of the financial crisis," according to a former member of WF Bank's Board of Directors. *Fortune* magazine praised Wells Fargo for "a history of avoiding the rest of the industry's dumbest mistakes." *American Banker* called Wells Fargo "the big bank least tarnished by the scandals and reputational crises."

40. The truth, however, was far from the public perception of the Company. The reality was that Wells Fargo was among the most poorly managed and corrupt major banks in the United States. Starting as early as 2002, Wells Fargo engaged in a variety of schemes in multiple product lines that had the primary effect of defrauding its customers to enrich the Company and earn bonuses for its managers. The primary fraudulent schemes included: (1) employing fraudulent consumer sales practices; (2) requiring improper force-placed auto insurance; (3) misuse of mortgage interest rate locks; (4) improperly repossessing automobiles of serving military personnel; (5) improper sale of complex financial products involving market linked investments ("MLIs"); and (6) erroneous foreclosures and loan modification denials. These scandals, which are addressed in detail below, have resulted in fines, restitution and Consent Orders from the OCC, the Federal Reserve, the CFPB, and the SEC, and have resulted in billions of dollars of payments by Wells Fargo to the government and defrauded consumers.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
-13-

41.     **Sales practices scandal** – The first, and most widely publicized, of Wells Fargo's many fraudulent schemes arose from practices at Wells Fargo's Community Bank, "the company's retail arm responsible for products such as consumer savings and checking accounts and credit and debit cards."[38]  Starting in May 2002, spurred by "aggressive" sales goal targets and a compensation structure that incentivized employees to engage in fraudulent practices for financial rewards, Wells Fargo employees opened deposit accounts and credit cards without the customers' knowledge or consent.[39]  In total, Wells Fargo employees created 1.5 million fake deposit accounts, with customers receiving about $2 million in penalties associated with those accounts; created 565,000 phony credit card accounts, resulting in $403,145 in fees to consumers; and "[e]nrolled customers in online bill pay plans that led to over 528,000 payments based on deceptive and fraudulent activities, such as creating fake email addresses."[40]  The fraudulent conduct was facilitated by an oversight environment that not only lacked effective supervisory control but was characterized by managers who would "berate, demean and threaten employees" who failed to meet sales quotas.

42.     Wells Fargo employees also signed customers up for renters and life insurance products without their knowledge.  "As of August 31, 2018, Wells Fargo identified over 5,500 questionable renters and simplified term life insurance policies opened" beginning in 2008.[41]  Wells Fargo employees also engaged in a variety of additional questionable sales practices, including falsely telling consumers they had to sign up for services they did not want in order to obtain desired services and lying about fees associated with accounts.[42]

43.     In 2016, this scandal resulted in several civil and criminal actions and settlements, including a ***$100 million*** fine and consent order with the CFPB; a ***$35 million*** penalty and consent order with the OCC; and a *$50 million* settlement with the County and City of Los Angeles.

44.     On February 21, 2020, Wells Fargo settled charges with the SEC and the Department of Justice ("DOJ") in which it agreed to pay ***$3 billion***, which included restitution of $500 million.[43]

---

[38] Republican Report at 12.
[39] *Id.*
[40] *Id.* at 12-13.
[41] *Id.* at 13.
[42] *Id.*
[43] *Id.* at 14-16.

Under the terms of the settlement, the DOJ will not pursue criminal charges against Wells Fargo if it cooperates with other investigations and complies with relevant laws for three years.

45.   **Force-placed auto insurance scandal** – Between 2005 and 2018, the Wells Fargo Auto Division, which financed auto loans and leases, forced hundreds of thousands of auto-loan borrowers to pay for unnecessary insurance coverage for their vehicles.  This "force-placed" insurance, imposed by Wells Fargo ostensibly to protect its collateral (the car) with respect to the loans where a customer lacked insurance, negatively impacted more than 850,000 of the Company's auto loan accounts who actually had sufficient insurance in place and did not require the "force-placed" coverage.  Typically, customers were charged over $1,000 per policy for the unnecessary coverage.[44]  These insurance charges may "have contributed to defaults that resulted in over 51,000 repossessions between 2005 and 2016" arising from the added insurance costs.[45]

46.   In April 2018, the OCC and CFPB fined Wells Fargo $1 billion in part for the Bank's force-placed insurance issue practices and a separate scandal involving the company's mortgage business—the mortgage rate lock scandal, discussed below.

47.   **Mortgage rate lock scandal** – Wells Fargo's Home Mortgage Division, which offered prospective borrowers fixed interest rates while their mortgage loan application was pending, could, under certain circumstances, charge a "rate lock extension fee" if the loan did not close by a certain date.  But an October 2016 internal audit "found that the bank had inconsistently applied its policy and continually charged borrowers Extension Fees in situations where Wells Fargo was responsible for the delay in the loan's closing."[46]  Some of the improper fees were as much as $4,500.

48.   In addition, Wells Fargo faced allegations that the bank "falsified processing records, so it could blame the delay [] on borrowers."[47]  In October 2017, Wells Fargo admitted to incorrectly charging 110,000 customers a total of more than $100 million in extension fees.  As noted above, this scandal, along with the force-placed auto insurance scandal, resulted in a ***$1 billion*** fine imposed by the OCC and CFPB.

---

[44] *Id.* at 17.
[45] *Id.* at 18.
[46] *Id.*
[47] *Id.*

49.    **Military repossession scandal** – From 2008 to 2015, Wells Fargo illegally seized nearly 900 automobiles owned by service members without obtaining a court order as required under the Servicemembers Civil Relief Act. The illegal repossession impacted active duty service members, including those deployed overseas.

50.    In September 2016, the DOJ brought charges against Wells Fargo, which ultimately agreed to repair the credit of the service members and to pay each service member $10,000, plus any lost equity in the vehicle, with interest.

51.    **MLI Scandal** – Wells Fargo Advisers (and its predecessor Wells Fargo Investments) (collectively "WFA") sold MLIs to its customers.

> An MLI is a fixed maturity financial product for which interest payments are determined by the performance of a reference asset or market measure such as a commodity index over the term of the product. MLIs involve significant upfront fees and are generally meant to be held by the investor until maturity.[48]

52.    Despite the long-term nature of these investments, WFA employees would recommend to customers that they sell existing investments and purchase new MLIs, ostensibly to "lock-in gains."  In reality, these transactions generated substantial fees for WFA, but entirely undermined the investment strategy for the customers.  Moreover, the transactions routinely were approved by supervisors despite internal Wells Fargo policies that prohibited short-term trading in or "flipping" of these products.[49]

53.    The SEC brought securities fraud charges against WFA, which were settled in June 2018.  As part of the settlement with the SEC, WFA agreed to restitution and fines of more than $5 million.

54.    **Improper mortgage foreclosure and loan modification denial scandal** – In November 2018, after an internal review, Wells Fargo admitted that it had erroneously failed to offer loan modifications to more than 850 customers who were in the foreclosure process as a result of improperly calculated attorneys' fees in foreclosure proceedings.  It ultimately erroneously foreclosed

---

[48] *Id.* at 19.
[49] *Id.* at 20.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
-16-

on two-thirds of them.  Wells Fargo indicated it was seeking to make restitution to the adversely impacted borrowers.

55.    These various scandals were a result of Wells Fargo's inadequate risk management framework and weak compliance practices.  As the testimony before the House Financial Services Committee that was investigating the wrongdoing at Wells Fargo found, the pervasive wrongdoing it experienced was the direct result of its unique operating culture described above.  A CFPB official told the Committee that "[i]t is unique in my experience for an entity to be so fragmented and have such fundamental problems in every area."[50]  The CFPB official testified:

> We have a lot of regulated entities that have problems. Typically, problems are limited to one product line or branch. Wells Fargo is different in that there were problems in every single product line we looked at. That sets them apart for a typical institution. It makes addressing those problems much more complicated.[51]

The CFPB official elaborated:

> One other aspect that sets Wells Fargo apart from other large banks, they ran compliance program by product line. Every division was in charge of developing its own compliance infrastructure, with no real incentive for doing it well so there were problems in every line, some more than others.  It is unique in my experience for an entity to be so decentralized and have such fundamental problems in every area.[52]

56.    As a result of the flaws in its operating structure, and the illegal conduct that resulted from those flaws, Wells Fargo was subject to approximately 10 consent orders or agreements settling litigation since 2016, requiring Wells Fargo and WF Bank to address these deficiencies.  The most significant consent orders are described below.

**D.    Wells Fargo Agreed To Multiple Consent Orders With Its Regulators Between 2016 And 2018**

57.    As a bank holding company and large financial institution, Wells Fargo is required to carefully manage risk.  Under Regulation YY promulgated by the Federal Reserve, the Company is required to "maintain a risk committee" and maintain a "global risk-management framework . . . commensurate with its structure, risk profile, complexity, activities, and size."[53]

---

[50] *Id.* at 50.
[51] *Id.*
[52] *Id.* at 51.
[53] 12 CFR 252.33.

1    58.    In addition to the multiplicity of rules and regulations that apply to bank holding

2    companies, some of which are set forth above, Wells Fargo also was subject to detailed, and in many

3    cases highly restrictive, requirements that were the result of a number of consent orders issued by

4    Wells Fargo's regulators in the wake of the various scandals that began to be publicly revealed in

5    2015 and 2016.

6                        **1.    The 2016 CFPB Order**

7    59.    Following the revelation of the sales practices scandal, on September 8, 2016, the

8    CFPB issued the 2016 CFPB Order, which imposed a fine of $100 million, the largest it had ever

9    imposed up to that time, and required Wells Fargo to reimburse customers for improperly imposed

10   fees.  Wells Fargo subsequently determined that its employees opened an estimated 3.5 million

11   unauthorized accounts resulting in approximately $6.1 million in erroneous banking fees.

12   60.    The CFPB further ordered Wells Fargo to cause an independent consultant to review

13   the Bank's sales practices and use the consultant's report to develop a plan (the "Compliance Plan")

14   to correct deficiencies and implement recommendations.  Wells Fargo was required to submit the

15   Compliance Plan to the CFPB for a determination of non-objection.  The 2016 CFPB Order also

16   required the Board to "review all submissions . . . required by this Consent Order before submission

17   to the [CFPB]" and stated "the Board will have the ultimate responsibility for proper and sound

18   management of [the Bank] and for ensuring that [the Bank] complies with Federal consumer financial

19   law and this Consent Order."[54]

20                        **2.    The 2016 OCC Order**

21   61.    On September 6, 2016, the OCC issued the 2016 OCC Order, which imposed a fine

22   of $35 million and required the Bank to develop and submit a "Comprehensive Action Plan" for

23   complying with the order's various requirements.[55]  The OCC explicitly ordered that the Board

24   "ensure that the Bank implements and thereafter adheres to the Action Plan" and "ensure that the

25   Bank achieves and thereafter maintains compliance with this Order."[56]  The Board was also required

26   _____

[54] 2016 CFPB Order at 13-14.

27   [55] In addition, Wells Fargo was required to pay $50 million to the City and County of Los Angeles,
     for total fines from the CFPB, the OCC, and Los Angeles of $185 million.

28   [56] 2016 OCC Order at 4-5.

to "ensure that . . . the Bank achieves and maintains an enterprise-wide risk management program designed to prevent and detect unsafe or unsound sales practices."[57]

62.     The 2016 OCC Order required Wells Fargo to, among other things, "develop an enterprise-wide sales practices risk management and oversight program" (Article V); implement "enterprise-wide policies and procedures for tracking, managing, and reporting customer complaints" (Article VI); review and revise the Bank's internal audit program (Article VII); and develop a "reimbursement plan" to remediate the harms arising from the illegal sales practices (Article VII).

### 3.     The 2018 FRB Order

63.     The 2018 FRB Order, which was entered on February 2, 2018, was issued by the Federal Reserve because it was "troubled" by revelations of Wells Fargo's illicit conduct:

> In September 2016, Wells Fargo Bank, N.A. entered into settlement agreements in which it disclosed that it had opened several million potentially unauthorized retail customer accounts and fired thousands of employees for improper sales practices between 2011 and 2015. Employees opened unauthorized accounts in response to demanding sales targets and incentives put in place by the bank's senior management. More recently, it has been disclosed that Wells Fargo Bank charged hundreds of thousands of borrowers for unneeded guaranteed auto protection or collateral protection insurance for their automobiles. Further, the firm has recently disclosed other compliance breakdowns. These events have caused substantial consumer harm and have troubled the Board of Governors.[58]

64.     In the 2018 FRB Order, the Federal Reserve specifically noted that Wells Fargo's "business strategy that emphasized sales and growth without ensuring that senior management had established and maintained an adequate risk management framework commensurate with the size and complexity of [Wells Fargo], which resulted in weak compliance practices."[59]  The order required Wells Fargo "to adopt an improved firmwide risk management program designed to identify and manage risks across the consolidated organization," consistent with Section 252.33(a)(2) of Regulation YY.[60]

---

[57] Id. at 5.

[58] Letter from Michael Gibson, Director, Division of Supervision and Regulation, Federal Reserve Board to Board of Directors, Wells Fargo & Co. (Feb. 2, 2018), https://www.federalreserve.gov/newsevents/pressreleases/files/enf20180202a2.pdf .

[59] 2018 FRB Order at 2.

[60] Id. at 1.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

-19-

65.    The 2018 FRB Order explicitly stated that the Board "is responsible for evaluating the Firm's risk management capacity."[61]  The order required the Board to submit a written plan, within 60 days of the order, "to further enhance the Board's effectiveness in carrying out its oversight and governance" (the "Board Effectiveness Plan").[62]  Among other things, the plan must address the "actions that the Board will take to further improve its effectiveness . . . further improve its oversight of senior management . . . [and] ensure senior management's ongoing effectiveness in managing [Wells Fargo]'s activities and related risks and promoting strong risk management."[63]

66.    The order also required Wells Fargo to "submit a written plan," within 60 days of the order, "to further improve its firmwide compliance and operational risk management program" (the "Risk Management Plan").[64]  Among other things, the plan must include "effective testing and validation measures for compliance and operational risks . . . specific measures management will take to integrate all applicable compliance and operational risk requirements . . . [and] specific measures to enhance the firmwide operational risk management program."[65]

67.    After adopting and implementing the Board Effectiveness Plan and Risk Management Plan, Wells Fargo would be further required to "conduct and complete by an appropriate date no later than September 30, 2018, an independent review of" the Board Effectiveness Plan and the Risk Management Plan.[66]

68.    In an unprecedented move, the Federal Reserve also placed a limit on Wells Fargo's growth.  Per the 2018 FRB Order, it imposed the Asset Cap limiting the Company to the assets reported as of December 31, 2017, which amounted to $1.95 trillion.  In August 2020, Bloomberg estimated that the Asset Cap had cost the Bank at least $4 billion in profits.[67]  The Asset Cap remains in place today.

---

[61] *Id.*
[62] *Id.* at 4.
[63] *Id.* at 4-5.
[64] *Id.* at 6.
[65] *Id.*
[66] *Id.* at 7.
[67] Hannah Levitt, *Wells Fargo Asset Cap Is Now One of the Costliest Bank Penalties*, Bloomberg (Aug. 24, 2020, 2:36 PM), https://www.bloomberg.com/news/articles/2020-08-24/wells-fargo-asset-cap-is-now-one-of-the-costliest-bank-penalties.

69.     The FRB specifically warned each Wells Fargo director that the agency would "closely monitor the performance of [Wells Fargo's] board in meeting supervisory expectations, including [Wells Fargo's] compliance with" the 2018 FRB Order.[68]

### 4.     The 2018 OCC Order

70.     Pursuant to the 2018 OCC Order, which was issued in April 2018, the OCC ultimately obtained from Wells Fargo a payment of $500 million. In addition, the OCC required the Company to submit requests to the Deputy Comptroller for a determination of "no supervisory objection" before certain classes of senior employees could receive payments under various aspects of Wells Fargo's compensation programs. Wells Fargo was required to certify that any such person as to which compensation was sought was not involved in the practices that were the subject of the 2016 OCC Order.

71.     The 2018 OCC Order detailed numerous findings relating to Wells Fargo's failures to comply with its legal obligations. One key finding was that "[s]ince at least 2011, the Bank has failed to implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile," which resulted in "reckless unsafe or unsound practices and violations of law."[69]

72.     The 2018 OCC Order detailed several issues at Wells Fargo, including (1) "reckless unsafe or unsound compliance risk management practices;" (2) "improper [collateral protection insurance ("CPI")] placement practices;" and (3) improper charges related to "the Banks's mortgage interest rate lock extension fee practices."[70]

73.     As to the Bank's risk management issues, the OCC found that Wells Fargo was unable "to execute on a comprehensive plan to address compliance risk management deficiencies," failed "to fill mission-critical staffing positions for Wells Fargo," failed to adequately report "to the Board regarding compliance concerns, the regulatory landscape, and the Bank's efforts to correct its

---

[68] Letter from Michael Gibson, Director, Division of Supervision and Regulation, Federal Reserve Board to Board of Directors, Wells Fargo & Co. (Feb. 2, 2018), https://www.federalreserve.gov/newsevents/pressreleases/files/enf20180202a2.pdf.
[69] 2018 OCC Order at 2.
[70] *Id.* at 2-4.

compliance problems and address regulatory changes," and failed to "adequately develop and implement key elements of its compliance risk management program."[71]

74.     As to the Bank's CPI practices, the OCC found that, "prior to June 2012, and continuing through October 2016 . . . borrowers were improperly charged CPI premiums, interest, and fees, and suffered loan delinquencies due to increased loan payment amounts."[72] And, "[i]n some cases, the Bank improperly repossessed vehicles from borrowers who had defaulted on their loans due to improperly placed or maintained CPI policies."[73]  These practices violated Section 5 of the Federal Trade Commission Act.[74]

75.     As to the Bank's mortgage practices, the OCC found that, "[b]eginning in at least September 2013 and continuing through March 2017 . . . customers were improperly charged mortgage interest rate extension fees when the Bank should have borne those costs."[75]  These practices violated Section 5 of the Federal Trade Commission Act.[76]

76.     In light of Wells Fargo's persistent illegal activity, the OCC mandated certain actions WF Bank must take to satisfy the 2018 OCC Order.  *First*, the OCC ordered the Board to "appoint and maintain an active Compliance Committee of at least three (3) members," which would be "responsible for monitoring and overseeing the Bank's compliance with the provisions of this Order."[77]  The Compliance Committee was required to "meet quarterly and maintain minutes of its meetings" and to submit "written progress report[s] to the Board" every 45 days (starting 120 days after the 2018 OCC Order).[78]

77.     *Second*, the OCC required Wells Fargo to develop and submit to the OCC, within 60 days, a Compliance Risk Management Plan "containing a complete description of the actions necessary and appropriate to achieve compliance" with the 2018 OCC Order.[79]  The order required

---

[71] *Id.* at 2-3.
[72] *Id.* at 3.
[73] *Id.*
[74] *Id.* at 3-4.
[75] *Id.* at 4.
[76] *Id.*
[77] *Id.* at 5.
[78] *Id.*
[79] *Id.*

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

Wells Fargo to establish an "Enterprise-Wide Compliance Risk Management Program" that included, among other things: "[a]n effective compliance risk framework that establishes the responsibility and accountability for respective front line units and independent compliance risk management;" "[a] program to develop, attract, and retain talent and maintain appropriate staffing levels to fulfill respective roles in the Bank's compliance risk management framework;" and "[a] program that establishes enterprise-wide policies and processes to ensure effective compliance governance and oversight for new products and services."[80]

78.    *Third*, the OCC required Wells Fargo to develop and submit to the OCC, within 60 days, a "Staffing Assessment and Program ('Staffing Assessment') for the Bank's independent Compliance Risk Management Program that will provide for the allocation of adequate resources." The OCC charged the Compliance Committee with the responsibility of "ensur[ing] that management corrects any deficiencies identified by the Staffing Assessment and implements any plans or recommendations resulting from the Staffing Assessment."[81]

79.    *Fourth*, the OCC required Wells Fargo to submit to the OCC, within 60 days, "a plan to enhance Internal Audit's program with respect to compliance ('Internal Audit's Compliance Program')."[82]

80.    *Fifth*, the OCC required Wells Fargo to develop and submit to the OCC, within 120 days, "a plan to develop and implement a Remediation Program ("Remediation Program") that is applicable to remediation activities conducted by the Bank."[83]   The OCC further required that "an independent unit, third party, or Internal Audit shall prepare a report validating that the Bank's implementation of the Remediation Plan is in compliance with the requirements of the Bank's Remediation Program."[84]

81.    The 2018 OCC Order explicitly required the Board to "ensure that the Bank submits the plans, programs, policies, and procedures to the Examiner-in-Charge for prior written

---

[80] *Id.* at 7-8.
[81] *Id.* at 9.
[82] *Id.* at 10.
[83] *Id.* at 11.
[84] *Id.* at 14.

1 determination of no supervisory objection" and to "ensure that the Bank has processes, personnel,

2 and control systems to ensure implementation of and adherence to the plans, programs, policies, and

3 procedures required by this Order."[85]

4           **5.      The 2018 CFPB Order**

5         82.      On April 19, 2018, Wells Fargo, by and through its Board, executed the 2018 CFPB

6 Order, which was entered on April 20, 2018.  The 2018 CFPB Order imposed a fine of $1 billion, to

7 be reduced by $500 million upon payment of that amount to the OCC.

8         83.      The 2018 CFPB Order identified two specific violations of federal consumer

9 protection law: (1) Wells Fargo "unfairly failed to follow the mortgage-interest-rate-lock process it

10 explained to some prospective borrowers;" and (2) Wells Fargo "operated its Force-Placed Insurance

11 program in an unfair manner."[86]

12         84.      The 2018 CFPB Order referred to the 2018 OCC Order and imposed many of the same

13 requirements on Wells Fargo, including the formation of a Compliance Committee and development

14 of an "acceptable enterprise-wide Compliance Risk Management Plan … designed to ensure that

15 [Wells Fargo's and the Bank's] acts and practices comply with Federal Consumer Financial Law and

16 the terms of [the 2018 CFPB Order]."[87]  The 2018 CFPB Order also required the Board to "review

17 all submissions (including plans, reports, programs, policies, and procedures) required by this

18 Consent Order before submission to the [CFPB]" and "for ensuring that [Wells Fargo and the Bank]

19 complies with Federal Consumer Financial Law and this Consent Order, including successful

20 execution of the Plans."[88]

21           **6.      The 2018 SEC Order**

22         85.      On June 25, 2018, the SEC issued against WFA an Order Instituting Administrative

23 And Cease-And-Desist Proceedings, Pursuant To Section 8a Of The Securities Act Of 1933, Section

24 15(b) Of The Securities Exchange Act Of 1934, And Section 203(e) Of The Investment Advisers Act

25 Of 1940, Making Findings, And Imposing Remedial Sanctions And A Cease-And-Desist Order.  The

---

[85] *Id.* at 22.
[86] *Id.* at 1.
[87] *Id.* at 13.
[88] *Id.* at 16.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

Order addressed Wells Fargo's MLI sales practices and its practice of advising customers to flip MLIs in order to earn fees for Wells Fargo, but to the detriment of the customers' investment strategy. WFA was required to "return $930,377 of ill-gotten gains, plus $178,064 of interest, and to pay a $4 million penalty.  Wells Fargo also agreed to a censure and to cease and desist from committing or causing any violations and any future violations of certain antifraud provisions of the federal securities laws."[89]

### E. Additional Compliance Deficiencies, Regulatory Penalties, and Lawsuit Settlements

86.    Between 2016 and 2022, Wells Fargo faced lawsuits and regulatory penalties alleging that the Bank had engaged in improper banking practices in, *inter alia*, its automobile servicing and home mortgage servicing divisions. In several instances the Bank paid hundreds of millions of dollars to settle consumer lawsuits arising from the misconduct. These settlements served as additional red flags to the Board of the Bank's compliance failures.

87.    In September 2016, Wells Fargo resolved allegations by the OCC and the DOJ that it violated the Servicemembers Civil Relief Act by repossessing 413 cars owned by protected servicemembers without obtaining a court order.[90]  The OCC assessed a $20 million penalty against the Company for these violations.[91]  Wells Fargo also agreed in a settlement with the DOJ to repair the servicemembers' credit and pay each $10,000, plus any lost equity in the vehicle with interest.[92] While it was in the process of settling the complaints, in November 2017, Wells Fargo identified an additional 450 service members whose vehicles Wells Fargo illegally repossessed and the Company agreed to pay an additional $5.4 million.[93]

---

[89] Press Release, SEC, *Wells Fargo Advisors Settles SEC Charges for Improper Sales of Complex Financial Products* (June 25, 2018), https://www.sec.gov/news/press-release/2018-112.

[90] Press Release, OCC, *OCC Assesses Penalty Against Wells Fargo; Orders Restitution for Violations of the Servicemembers Civil Relief Act* (Sept. 29, 2016). https://www.occ.gov/news-issuances/news-releases/2016/nr-occ-2016-119.html.

[91] *Id.*

[92] Press Release, DOJ, *Justice Department Reaches $4 Million Settlement with Wells Fargo Dealer Services for Illegally Repossessing Servicemembers' Cars* (Sept. 29, 2016), https://www.justice.gov/opa/pr/justice-department-reaches-4-million-settlement-wells-fargo-dealer-services-illegally.

[93] Press Release, DOJ, *Justice Department Obtains $5.4 Million in Additional Relief to*

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

88.     In October 2016, Wells Fargo agreed to pay $50 million to settle a class action lawsuit that accused the Company of overcharging approximately 250,000 homeowners for appraisals ordered after they defaulted on their mortgage loans.[94]

89.     On October 26, 2017, the Financial Industry Regulatory Authority ("FINRA") found that Wells Fargo broker-dealers made unsuitable recommendations of volatility-linked-exchange-traded products to customers.[95]  FINRA ordered the Company to pay more than $3.4 million in restitution.

90.     In January 2017, before this court, Wells Fargo settled a derivative action arising from the sales practices scandal for a record-setting $240 million cash payment to the Company.[96]

91.     In April 2017, Wells Fargo agreed to pay $142 million to settle a consumer class action relating to the sales practices scandal.[97]

92.     In June 2018, Wells Fargo paid $5.1 million to settle charges from the SEC that it improperly pushed retail customers to actively trade complex investments in order to generate fees. Wells Fargo agreed to return $930,377 in fees and commissions (plus interest) for those investments and pay a $4 million penalty to the SEC.[98]

93.     In July 2018, Wells Fargo agreed to pay $480 million to settle a securities fraud class action alleging that Wells Fargo made material misstatements in its securities filings relating to the sales practices scandal.[99]

---

*Compensate Servicemembers for Unlawful Repossessions by Wells Fargo Dealer Services* (Nov. 14, 2017), https://www.justice.gov/opa/pr/justice-department-obtains-54-million-additional-relief-compensate-servicemembers-unlawful.
[94] *See Bias v. Wells Fargo & Co.*, No. 4:12-cv-664 (N.D. Cal. Oct. 28, 2016) (Dkt. 248-1).
[95] Press Release, FINRA, *FINRA Orders Wells Fargo Broker-Dealers to Pay $3.4 Million in Restitution and Reminds Firms of Sales Practice Obligations for Volatility-Linked Products* (Oct.16, 2017), https://www.finra.org/media-center/news-releases/2017/finra-orders-wells-fargo-broker-dealers-pay-34-million-restitution-and.
[96] *See In re Wells Fargo & Co. S'holder Derivative Litig.*, 2017 WL 130282 (N.D. Cal. Jan. 12, 2017.)
[97] *See Jabbari v. Wells Fargo & Co.*, No. 3:15-cv-2159 (N.D. Cal. filed May 13, 2015).
[98] Press Release, SEC, *Wells Fargo Advisors Settles SEC Charges for Improper Sales of Complex Financial Products* (June 25, 2018), https://www.sec.gov/news/press-release/2018-112.
[99] *Hefler v. Wells Fargo & Co.*, No. 4:16-cv-5479 (N.D. Cal. July 31, 2018) (Dkt. 225).

94.     On October 22, 2018, the Company agreed to pay a $65 million penalty to resolve an investigation by the New York Attorney General into Wells Fargo's statements to investors regarding its deceptive sales practices.[100]

95.     On December 28, 2018, Wells Fargo agreed to pay $575 million to settle claims of unfair and deceptive practices brought by all 50 states and the District of Columbia.[101]

96.     On January 2, 2019, Wells Fargo agreed to pay a $5 million penalty imposed by the California Department of Insurance.[102]  The Company agreed to exit the personal insurance market in California through at least 2022, and to pay $5 million in the event it sought to return to the California personal insurance market.

97.     In March 2019, the Bankruptcy Court for the Western District of North Carolina granted final approval to a consumer class action settlement arising from Wells Fargo's imposition of a trial loan modification program on borrowers without their consent, leading to increased defaults. Wells Fargo agreed to pay $13.46 million to settle these claims.[103]

98.     In February 2020, the SEC charged Wells Fargo with failing to supervise investment advisers and registered representatives who recommended investments to retail investors, and for lacking adequate compliance policies and procedures with respect to the suitability of those recommendations.  The SEC ordered Wells Fargo to pay a $35 million penalty, which the SEC distributed to the harmed investors.[104]

---

[100] Press Release, N.Y. Att'y Gen., *A.G. Underwood Announces $65 Million Settlement With Wells Fargo For Misleading Investors Regarding Cross-Sell Scandal* (Oct. 22, 2018), https://ag.ny.gov/press-release/2018/ag-underwood-announces-65-million-settlement-wells-fargo-misleading-investorshttps://ag.ny.gov/press-release/2018/ag-underwood-announces-65-million-settlement-wells-fargo-misleading-investors.
[101] Imani Moise, *Wells Fargo to pay $575 million in settlement with U.S. States*, Reuters (Dec. 28, 2018), https://www.reuters.com/article/us-wells-fargo-settlement/wells-fargo-to-pay-575-million-in-settlement-with-u-s-states-idUSKCN1OR19Q.
[102] Press Release, Cal. Dept. of Ins., *$10 million penalty in Wells Fargo case* (Jan. 2, 2019), https://www.insurance.ca.gov/0400-news/0100-press-releases/2019/release001-19.cfm.
[103] *Cotton v. Wells Fargo & Co.*, No. 17-03056 (Bankr. W.D.N.C. Mar. 15, 2019), ECF No. 117.
[104] Press Release, SEC, *SEC Charges Wells Fargo In Connection With Investment Recommendation Practices* (Feb. 27, 2020), https://www.sec.gov/news/press-release/2020-43.

99.     In September 2020, FINRA fined Wells Fargo $675,000 and ordered it to pay $1.4 million in restitution for failing to supervise recommendations that customers switch from variable annuities to investment company products.[105]

100.    In January 2021, Wells Fargo agreed to pay $40 million to resolve a consumer class action regarding allegations that the Company misled small businesses about fee structures and charges associated with payment processing services, resulting in overcharges and excessive early termination fees.[106]

101.    In March 2021, Wells Fargo agreed to pay $6.9 million to resolve a consumer class action regarding allegations that the Company misled borrowers about interest rates during the first year of their mortgage loans, in violation of the Truth in Lending Act.[107]

102.    Also in 2021, Wells Fargo agreed to pay $72.6 million to settle a lawsuit by the U.S. Attorney for the Southern District of New York arising from overcharging hundreds of commercial customers who used foreign exchange services by systematically charging them higher markups on transactions than represented and concealing overcharges.[108]

103.    In June 2021, Wells Fargo paid $500 million to settle a 2018 consumer class action arising from Company's failure to refund unused fees from service allowing customers to prepay for debt cancellation on outstanding car loans in case their automobile was totaled (i.e. GAP insurance).[109]

104.    In April 2022, the Company paid $12 million to settle a 2019 consumer class action regarding errors in Wells Fargo's automated mortgage loan modification tools, resulting in the alleged denial of legally required mortgage modifications.[110]

---

[105] Press Release, FINRA, *Firms to Pay $1.4 Million in Restitution to Approximately 100 Affected Customers* (Sept. 2, 2020), https://www.finra.org/media-center/newsreleases/2020/finra-sanctions-wells-fargo-clearing-services-llc-and-wells-fargo.
[106] *Patti's Pitas LLC v. Wells Fargo Merch. Servs. LLC,* No. 1:17-cv-4583 (E.D.N.Y. Jan. 12, 2021), ECF No. 58.
[107] *Carrillo v. Wells Fargo Bank, N.A.*, No. 2:18-cv-3095 (E.D.N.Y. Mar. 5, 2021), ECF No. 91.
[108] Press Release, DOJ, *Manhattan U.S. Attorney Announces $72.6 Million Settlement Of Fraud Lawsuit Against Wells Fargo Bank For Overcharging Foreign Exchange Customers Over Seven Years* (Sept. 27, 2021), https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-726-million-settlement-fraud-lawsuit-against-wells.
[109] *See Herrera et al. v. Wells Fargo Bank et al.*, No. 8:18-cv-00332 (C.D. Cal.).
[110] *See Ryder et al. v. Wells Fargo Bank NA*, No. 1:19-cv-00638 (S.D. Ohio).

**F.      The Board Knowingly and Deliberately Failed To Oversee and Ensure The Company's Compliance With The Consent Orders**

105.     Upon the execution of each of the Consent Orders, the Board was on notice that it must greatly improve its oversight of management to ensure compliance with the various consent orders still open against Wells Fargo and WF Bank.  The Board was required to review and/or approve the Company's plans before submission to regulators and "provide a credible challenge to management."[111]  The Board, however, knowingly and deliberately shirked those duties and allowed management to submit consistently "shoddy, incomplete, and in some cases, late" plans required by the regulators.[112]  The House Committee concluded that "[t]he chronic deficiencies in the company's submissions indicate the Board has not been sufficiently involved in the regulatory compliance effort."[113]

**1.      Throughout 2018 and 2019, The Board And Management Focused On Lifting The FRB's Asset Cap And Improving Earnings Rather Than Complying With The Consent Orders**

106.     Following the entry of the 2018 FRB Order, Wells Fargo's top priority was to get out from under the Asset Cap as quickly as possible.  As shown below, management's focus on the Asset Cap, and the Board's unwillingness to hold management accountable, resulted in the quick submission of woefully insufficient plans and, consequently, admonishments from the regulators receiving those plans.

107.     In particular, CEO Sloan was laser focused on removing the Asset Cap because it constrained Wells Fargo's growth opportunity and earnings potential, rather than actually remedying the multiple problems that were the focus of the regulators' concerns.  The OCC testified before a Congressional Committee as follows:

Q:      What was Tim Sloan's highest priority?

A:      The asset cap was Sloan's highest priority in 2018, no question.[114]

Amanda Norton, hired as Wells Fargo's Chief Risk Officer in June 2018, also told Congress about Sloan's focus on the Asset Cap:

---

[111] Republican Report at 2.
[112] *Id.* at 69.
[113] *Id.*
[114] *Id.* at 30.

Q   Have you ever heard from anyone at Wells Fargo that Mr. Sloan was overly focused on lifting the asset cap with respect to the Fed consent order versus remediating the issues that the consent order identified?

A   I think Tim had focus on lifting the asset cap, yes.[115]

108.   Internal emails also demonstrated Wells Fargo's focus on removing the Asset Cap, as opposed to actually complying with the various Consent Orders.   When senior members of management proposed an "integrated approach" to addressing similar risk management reforms required by the Consent Orders, Sloan rejected that approach, stating that he wanted to avoid complicating the Federal Reserve's decision on lifting the asset cap: "I am very concerned with melding of three regulatory [consent orders] as we do not want each agency to effectively have veto rights over the Asset Cap review."[116]

109.   In order to have the Asset Cap removed as quickly as possible, Wells Fargo had suggested a deadline of September 30, 2018, for Wells Fargo to have completed "third-party review" of the plans required under the 2018 FRB Order.   This necessitated an internal deadline of July 31, 2018 to complete the plans.   This was a priority of the Board as well as Sloan, and a senior Wells Fargo executive communicated this expectation of Wells Fargo's Board to Federal Reserve staff in a March 29, 2018 meeting.[117]

110.   At the March 29, 2018 meeting, the Federal Reserve's staff had suggested that the July 31, 2018 deadline may not have been reasonable, and Well Fargo's own Internal Audit department told the Federal Reserve that the internal July 31, 2018 implementation deadline "would not provide sufficient time to validate the effectiveness" of the plans.[118]   According to meeting minutes created by the Federal Reserve, a senior Wells Fargo executive told the FRB that "they wish they had more time," but the Wells Fargo Board was pressing to meet the July 31, 2018 deadline.[119]

111.   The Wells Fargo Board was explicitly warned about regulators' concerns with the Company's consent order compliance in a meeting with Federal Reserve officials on April 3, 2018.[120]

[115] *Id.*
[116] Majority Report at 50.
[117] *Id.* at 48.
[118] *Id.*
[119] *Id.*
[120] *Id.*

1    The Federal Reserve staff particularly expressed concern that the focus of Wells Fargo's CEO on

2    quickly lifting the Asset Cap could be inconsistent with the Federal Reserve's objectives in imposing

3    the 2018 FRB Order, which focused on ensuring that Wells Fargo operated in a safe and sound

4    manner.[121]    Further, the Federal Reserve was concerned that Wells Fargo could not meet the

5    September 30, 2018 deadline for third-party review of its plans under the 2018 FRB Order, despite

6    the Company having selected that deadline.[122]

7        112.    Further, in a May 2018 meeting between Wells Fargo and the OCC, the OCC staff

8    informed Wells Fargo Board members that the OCC was concerned about an "excessive focus on

9    earnings impact" on the part of Wells Fargo:

10            [The senior OCC official] has a growing issue in [their] head that we are too
            focused on financial performance, and that focus impairs progress in some
11           other areas. . . In advancing proof points for this growing perception, [the OCC
            official] indicated that discussions in negotiating the recent consent order from
12           the OCC, [the OCC official] was surprised that both Allen [Parker] and Betsy
            [Duke] commented on the 'earnings' impact of some matters included, and
13           that he did not expect that from the GC or Chair.[123]

14       113.    The OCC also voiced its concerns to the entire Board in a July 24, 2018 Board

15    meeting.[124] During the meeting, the OCC expressed concern with "management's focus on earnings"

16    and advised the Board on "the importance of similarly focusing on addressing outstanding regulatory

17    issues."[125]    The OCC also advised Wells Fargo "to examine its approach in remediating customers,

18    including the importance of keeping the interests of customers top of mind and taking a broad view

19    when remedying customer harm."[126]

20       114.    Just a month later, on August 11, 2018, then-Board Chair Duke, WF Bank Chair

21    Quigley, CEO Sloan, and a senior Wells Fargo executive met with Comptroller Joseph Otting and

22    senior OCC officials in Washington, DC to discuss the OCC's concerns with Wells Fargo's progress

23    on compliance.    According to meeting notes from Duke, the OCC again specifically stated that

24

25    _____
[121] *Id.* at 49.
26   [122] *Id.* at 48-49.
[123] *Id.* at 55 (citing Email from Quigley to Duke, Peetz, Sloan, et al. (May 23, 2018).
27   [124] *Id.*
[125] *Id.*
28   [126] *Id.* at 56.

"[m]anagement and the Board prioritize or over-focus on earnings at the expense of risk management." [127]

115.    While Wells Fargo's goal, which it expressed to investors, was to exit the Asset Cap restrictions by mid-2019, it changed its goal to the end of 2019 after Federal Reserve Chairman Jerome Powell wrote to Sen. Elizabeth Warren that the Federal Reserve "does not intend to lift the asset cap until remedies to these issues have been adopted and implemented to our satisfaction."[128]

116.    On January 24, 2019, officials from the Federal Reserve, in a meeting with senior Wells Fargo executives, continued to express their concern about Wells Fargo's apparent obsession with lifting the Asset Cap.[129]  The Federal Reserve told Wells Fargo that:

> [Wells Fargo] leadership seems to remain focused on lifting the asset cap by the end of the year as the primary goal, and is shaping remediation plans around that. This is affecting the way management is thinking (or being asked to think) about how remediation should be shaped and accomplished.[130]

The Federal Reserve further informed Wells Fargo that its plan to complete implementation of its plans by September 2019 under the 2018 FRB Order was "improbable and unrealistic."[131]

117.    In April 2019, after Sloan's departure, interim CEO Allen Parker told an analyst that Wells Fargo would discontinue the practice of reporting a timetable for lifting the Asset Cap.[132]

### 2.    The Board Failed To Hold Management Accountable For Wells Fargo's Failure To Comply With The Regulators' Clearly Expressed Compliance Requirements

118.    Concerns about CEO Sloan's performance, and his singular focus on lifting the Asset Cap rather than actually engaging in a good faith attempt to comply with the 2016 Consent Orders and the 2018 FRB Order, arose as early as May 2018, when the Federal Reserve rejected Wells Fargo's first submissions under the 2018 FRB Order as "materially incomplete."  Defendant Craver wrote to Duke addressing Sloan's inadequate performance:

---

[127] *Id.* at 55.
[128] *Id.* at 52.
[129] Republican Report at 25; Majority Report at 52.
[130] Majority Report at 52.
[131] *Id.* at 53.
[132] *Id.*

1
2
3
4
5

> Speaking frankly, this was a big miss that doesn't reflect well on Tim. It would seem that there is little under the very important category of "clean up the mess" that is bigger than this recent submission to the Fed.
>
> We shouldn't have to take a Mulligan. I imagine that investors and customers would view this feedback from the Fed as completely unacceptable. I would expect to hear from them something along the lines of, 'is there anything you can get right?'[133]

119.    On August 11, 2018, senior OCC officials raised multiple issues in a meeting with Duke, Quigley, and Sloan, including that the Bank was "not holding people accountable."[134] However, the Board did nothing to address the OCC's concern and even ignored warnings from Wells Fargo's internal auditors, allowing management to continue missing deadlines and submitting insufficient plans.

120.    On January 7, 2019, Karen Peetz ("Peetz") announced her decision not to seek reelection for her position on the Board in April 2019.[135] Peetz's retirement came "amidst her colleagues' unwillingness to hold management accountable" and Peetz's frustration with Sloan's leadership.[136] Peetz later told the House Committee that the Board did not move fast enough to remove certain executives, including Sloan.[137] Peetz also testified that she and Chief Risk Officer Amanda Norton had urged Sloan to hire a Chief Operating Officer to run an enterprise-wide risk management program, noting that the OCC had "indicated that [hiring a COO] was standard procedure" and that the "whole Board believed Sloan should hire a COO."[138] But "[a]fter Sloan spoke with every director, he came to the decision that he would not hire a COO."[139] Though "[t]he Board wanted this position filled," it acquiesced to Sloan's insistence that it remain vacant.[140] The Board did not hire a COO until December 2019.[141]

[133] *Id.* at 57.
[134] *Id.* at 55, 57.
[135] *Karen Peetz to retire from Wells Fargo Board*, Reuters (Jan. 7, 2019, 4:50 PM), https://www.reuters.com/article/us-wells-fargo-board/karen-peetz-to-retire-from-wells-fargo-board-idUSKCN1P125O.
[136] Republican Report at 6.
[137] *Id.*
[138] *Id.* at 27-28.
[139] *Id.* at 28.
[140] *Id.* at 28-29.
[141] *Wells Fargo Names Scott Powell Chief Operating Officer*, Business Wire (Dec. 2, 2019, 4:10 PM), https://www.businesswire.com/news/home/20191202005937/en/Wells-Fargo-Names-Scott-Powell-Chief-Operating-Officer.

121.    On February 22, 2019, Senator Elizabeth Warren sent a public letter to FRB Chairman Powell regarding a new report that, beginning in 2016, Wells Fargo's Wholesale Banking Division "routinely falsified clients' signatures and otherwise doctored paperwork" in order to comply with a legal settlement with the OCC related to violations of anti-money laundering laws. The letter noted that Sloan led the Wholesale Banking Division at the time the illegal activity started. Senator Warren expressed concern that Wells Fargo was unable to "ensure senior management's ongoing effectiveness in managing the Firm's activities and related risks and promoting strong risk management across the Firm."

122.    Also on February 22, 2019, the OCC requested a meeting with Quigley, Duke, and Sloan to discuss "progress and accountability," proposing to meet on March 7 or 8, 2019.[142]  Quigley sought to push the meeting to a later date, expressing "surpris[e]" at the OCC's "sense of urgency."[143]

123.    Meanwhile, the Board was busy approving a large compensation bonus for Sloan and deciding how to approach the announcement of the bonus amid the Company's regulatory issues. On March 3, 2019, Duke emailed a draft proxy statement to Sloan to discuss how to "set up our discussion of your compensation in the proxy and accompanying press materials."[144]  Duke's proposed draft proxy statement include references to the "substantial amount of work remaining to meet the expectations outlined in the [Consent Orders]," but Sloan recommended softening the language because it might cause "stakeholders [to] jump to the conclusion it means we are not close to lifting the asset cap and it may give regulators even more confidence in criticizing us."[145]  Sloan also recommended not listing all the consent orders in the proxy, but "rather focus[ing] on general regulatory matters."  Duke subsequently agreed to "tone down" the proxy.[146]

124.    On March 13, 2019, Wells Fargo announced in its annual proxy that the Board had awarded Sloan $18.4 million in compensation for 2018, including a $2 million performance bonus.[147]

---

[142] Majority Report at 45.
[143] Id.
[144] Id. at 58.
[145] Id.
[146] Id.
[147] Id. at 57-58.

The FRB released a statement stating that the agency "does not approve pay packages" but "expect[s] boards of directors to hold management accountable."[148]

125.    That same day, the OCC met with the Bank's Board of Directors to discuss compliance issues and, midway through the meeting, asked Sloan to leave.  The OCC's talking points then indicate that they told the Board: "[w]e are also concerned that the Board has not held management appropriately accountable and driven more change . . . Tim [Sloan] has been reluctant to make the necessary changes and he has very clearly been reluctant to hold senior executives accountable."[149] The talking points continue:

> [E]fforts to hold people accountable are too slow and often questionable in approach. There are many examples here where Tim has failed to show the leadership necessary to move the institution forward when it is clear that there are significant problems. We've seen this in compliance, in risk . . . to name a few areas where the unwillingness to hold people accountable has been very costly to the institution in terms of both money and time lost and pose serious reputation and safety and soundness risks to the bank if they remain uncorrected.[150]

126.    On March 15, 2019, a Federal Reserve official spoke with Peetz and asked her "if it was clear [from the March 13 meeting] that the OCC is shortening the runway for [Sloan]'s succession."[151]  Peetz relayed the call to Duke, "who asked her to relay the exchange 'word-for-word' to the full board."[152]  The Board met on or about March 19 to discuss the regulators' concerns about Sloan.[153]

127.    According to an internal email produced by the OCC, OCC staff met directly with Sloan on March 20, 2019, to discuss "the OCC['s] view on the lack of progress and failure to hold people accountable" during which they informed Sloan of the concerns that had been raised on March 13th when he was not present, including the OCC's dissatisfaction with Sloan's performance as CEO.[154]

---

[148] *Id.* at 7.
[149] *Id.* at 59.
[150] *Id.*
[151] *Id.*
[152] *Id.* at 59-60.
[153] *Id.* at 60.
[154] *Id.*

128.    On March 28, 2019, just two weeks after the Board massively rewarded him, Sloan finally resigned his position as CEO.[155]

129.    In September 2019, Wells Fargo hired Defendant Scharf as CEO.[156]  In February 2020, Wells Fargo announced organizational changes, appointing "several new business leaders" and implementing "changes designed to create a flatter line of business organizational structure and provide leaders with clear authority, accountability, and responsibility."[157]  The changes included the appointment of CEOs for five different lines of business, each reporting to CEO Scharf and "represented on the company's Operating Committee."[158]

### 3.    The Board's And Management's Myopic Focus On The Asset Cap And Earnings Resulted In Failure To Comply With The Consent Orders' Requirements

130.    Wells Fargo's improper focus on the Asset Cap and earnings issues, and the Board's unwillingness to hold senior management responsible, was reflected in multiple years' worth of non-compliance with the various Consent Orders to which Wells Fargo was subject, as well as additional violations of federal law.

131.    On April 3, 2018, Wells Fargo submitted to the Federal Reserve its first written Board Effectiveness Plan and Risk Management Plan, as required under the 2018 FRB Order.[159]  On May 7, 2018, in a letter to Duke and Sloan, the Federal Reserve rejected the April 3, 2018 submissions as so "materially incomplete" that they could not "be evaluated by [Federal Reserve] staff for their adequacy."[160]  Both plans were "missing key elements" and "lacked milestones and timelines *required under the consent order*."[161]  For example, the Risk Management Plan failed to

---

[155] Imani Moise, David Henry, *Wells Fargo CEO Tim Sloan steps down*, Reuters (Mar. 28, 2019, 4:20 PM), https://www.reuters.com/article/us-wells-fargo-ceo/wells-fargo-ceo-tim-sloan-steps-down-idUSKCN1R92MJ.
[156] Press Release, Wells Fargo, *Wells Fargo Names Charles W. Scharf Chief Executive Officer and President* (Sept. 27, 2019), https://newsroom.wf.com/English/news-releases/news-release-details/2019/Wells-Fargo-Names-Charles-W.-Scharf-Chief-Executive-Officer-and-President/default.aspx.
[157] Press Release, Wells Fargo, *Wells Fargo Announces Organizational Changes* (Feb. 11, 2020), https://newsroom.wf.com/English/news-releases/news-release-details/2020/Wells-Fargo-Announces-Organizational-Changes/default.aspx.
[158] *Id.*
[159] Republican Report at 76; Majority Report at 37-38.
[160] Majority Report at 38.
[161] Republican Report at 75 (emphasis added).

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
-36-

1  "comprehensively address operational risk," which was a "key focus of the [2018 FRB Order]."[162]

2  The Federal Reserve gave Wells Fargo 90 days to revise the plans to be consistent with the agency's

3  feedback.[163]  Wells Fargo then failed to meet that 90-day deadline, and instead sought two extensions

4  before finally submitting revised plans on October 31, 2018.[164]

5         132.    In June 2018, Wells Fargo reorganized its consent order management office (calling

6  it the Consent Order Program Office, or "COPO"), but the changes did not quell regulators' concerns

7  about Wells Fargo's inability or unwillingness to comply with the Consent Orders.[165]  The OCC

8  expressed to Sloan and the Board the agency's "concerns with the team managing the company's

9  response to the consent orders."[166]  The OCC would later tell the House Committee that "there seemed

10  to be no change as to how the bank was dealing with regulatory compliance through [the] COPO,

11  which consisted largely of the same staff and resources as its predecessor."[167]

12         133.    On June 19, 2018, Wells Fargo submitted its first plans to the OCC under the 2018

13  OCC Order.[168]  The OCC rejected the submission by letter dated July 24, 2018, noting that "[d]espite

14  the OCC including detailed requirements and expectations . . . the bank's submission response lacks

15  substance and detail in a number of areas."[169]  The OCC directed Wells Fargo to resubmit its

16  remediation plan because "the plan does not provide full remediation for all impacted customers, and,

17  in some instances, the Bank's initial plan results in the inconsistent and potentially unfair treatment

18  of customers who experienced similar harm."[170]  The OCC also directed Wells Fargo to resubmit its

19  internal audit plans.[171]  The OCC warned Wells Fargo that it could take further action if Wells Fargo

20  continued to submit inadequate plans.[172]

21

22  _____

[162] Majority Report at 38.

23  [163] *Id.*

[164] *Id.*

[165] Republican Report at 58.

24  [166] *Id.*

[167] *Id.* at 58-59.

25  [168] Majority Report at 39.

[169] *Id.*

26  [170] *Id.* at 39-40.

[171] *Id.* at 40.

27  [172] *Id.* ("The length of time a Bank takes to achieve full compliance with all provisions of an enforcement action is a factor in the OCC's determination of any future supervisory and/or enforcement actions.  Management's action plan and timeframes for completion should demonstrate

28

134.    On September 28, 2018, Wells Fargo Audit Services, in a report to the RCOC, rated management's compliance with the 2018 Consent Orders as "red," meaning a "significant risk of schedule delay or missed milestones, key issue has not been addressed yet, or control design and/or project management are insufficient to effectively mitigate key risks."

135.    Also on September 28, 2018, the RCOC reviewed and approved Wells Fargo's "CPI remediation plan," which had been revised purportedly to "make the plan simpler, more comprehensive, and more customer favorable." Yet on November 21, 2018, the OCC rejected Wells Fargo's resubmitted plan, writing that "the portion of the CPI Remediation Plan specific to Wells Fargo Auto Finance (WFAF) . . . is not adequately supported."[173]

136.    On October 18, 2018, the RCOC met again and discussed that "less than a full plan will be submitted" to the FRB "because some of the program detail will not be complete at the time of submission." On October 31, 2018, Wells Fargo resubmitted its written plans to the Federal Reserve, and the Federal Reserve again rejected the plans for insufficiency and informed Wells Fargo "of *possible escalations* if the company continued to submit incomplete plans," including potential "*additional actions* if the bank were to produce unacceptable plan materials along the lines of its first two plan submissions.[174]

137.    On December 14, 2018, WFAS reported to the RCOC that Wells Fargo's "Business Process Integration action plan" was merely a "plan for a plan." WFAS also reported that "resourcing" for the implementation of the Remediation Plan under the 2018 OCC Order and 2018 CFPB Order was "at-risk given the volume of work to complete within tight timeframes." WFAS also rated the Company's Compliance Plan as "at-risk."

138.    Wells Fargo's known inability to submit completed plans was a major source of friction between the Company and regulators. The CFPB's Western Regional Director testified that Wells Fargo would often submit a "plan for a plan" instead of a complete submission and the quality of the plans showed a lack of understanding as to the extent of the actions that would be necessary to

---

prompt corrective actions that are appropriately designed and will result in effective and sustainable resolution of the longstanding, uncorrected issues that are included in this [consent order].").
[173] Majority Report at 62.
[174] Majority Report at 38; Republican Report at 76-77 (emphasis added).

comply with CFPB's orders.[175]   As a result, he told the House Committee that the CFPB quickly became frustrated with the Bank's submissions.[176]  This information was conveyed directly to Wells Fargo in late 2018, and multiple times thereafter.[177]

139.   On January 25, 2019, the RCOC met and received WFAS' latest report, which indicated that the Company's Customer Remediation plans under the 2018 OCC Order and 2018 CFPB Order were "at risk" due to inadequate resources and a "large number of deliverables" still due.  Wells Fargo's CRMP was rated "off track" due to "delayed implementation of a milestone." The RCOC, however, focused mainly on the 2018 FRB Order, noting its priority on "potential areas of FRB focus."

140.   On February 15, 2019, the OCC staff emailed the Wells Fargo Board Chair to express that the OCC was "deeply concerned about the continuing (and in some cases worsening) problems in a number of areas, evidenced by large number of extension requests, missed expected completion dates that are not communicated in a timely manner, failed audit validations, and extensions of Consent Order deadlines."[178]

141.   On February 21, 2019, the RCOC met and received WFAS' report, which included several red flags that the Company's compliance efforts were off track and in need of better Board oversight.  The report noted "resource constraints across all efforts" regarding the 2018 FRB Order. The report also noted that the Company's CRMP under the OCC and CFPB orders remained "at-risk."  Management noted to the committee that "issues management and project management resource strain need to be addressed."  But the Board did nothing to improve management's resources, an issue which persisted for at least the next year.

142.   On March 4, 2019, the OCC reported that "management and board oversight remain inadequate" in response to the 2018 OCC Order, and expressed "frustration with the lack of progress and continued incomplete submissions to the regulators."[179]  Later that month, the OCC met with the

---

[175] Majority Report at 36; Republican Report at 69.
[176] Republican Report at 69.
[177] *Id.* at 70-72.
[178] Majority Report at 64.
[179] Republican Report at 23.

1  Board and advised the directors that "[p]rogress has been very slow at best, and in many cases simply

2  insufficient."[180]  The OCC also warned about "further safety and soundness concerns," noting that

3  Wells Fargo was "no[] stronger than [when it] emerged from the Sales Practices mess in 2016."[181]

4  The OCC expressed particular frustration with then-CEO Sloan, telling the Board (after asking Sloan

5  to leave the meeting) that "[w]e believe accountability starts at the top of the institution.  In this case,

6  Tim has had over two years to demonstrate his leadership over Wells Fargo and the results—in risk,

7  technology, and compliance . . . are clear."[182]

8          143.    On March 11, 2019, the FRB sent a letter to the Chair of the Wells Fargo Board and

9  noted that the Company's October 31, 2018 plan submission included "fundamental gaps."[183]  The

10  FRB warned that a "third failure to submit acceptable plans could cause the [FRB] to consider

11  additional actions."[184]

12          144.    On March 12, 2019, after Sloan testified in front of the House Committee, the OCC

13  released a written statement openly criticizing Wells Fargo's performance under the 2018 Consent

14  Orders.  The OCC wrote that it "continue[s] to be disappointed with [Wells Fargo's] performance

15  under our consent orders and its inability to execute effective corporate governance and a successful

16  risk management program.  We expect National Banks to treat their customers fairly, operate in a

17  safe and sound manner, and follow the rules of law."[185]

18          145.    On March 13, 2019, the same day that Wells Fargo had announced Sloan's massive

19  $18+ million pay package, the OCC met with the Board and "specifically raised concerns about

20  Sloan's commitment to accountability and progress on remediation."[186]  The OCC stated its concern

21  "that the Board has not held management appropriately accountable and driven more change," noting

22  that "efforts to hold people accountable are too slow and often questionable in approach."[187]

23

24  _____

25  [180] *Id.* at 27.
   [181] Majority Report at 64-65.

26  [182] Republican Report at 27.
   [183] Majority Report at 38.

27  [184] *Id.* at 39.
   [185] *Id.* at 8.

28  [186] Republican Report at 27.
   [187] Majority Report at 59.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1   146.    On March 21, 2019, the RCOC met and received WFAS' report. WFAS again noted

2   "resource constraints across all efforts" regarding the 2018 FRB Order and that "key items [] still

3   need to be addressed." WFAS also reported that the CRMP under the OCC and CFPB orders

4   remained "at risk."

5   147.    On April 18, 2019, WFAS reported to the RCOC that compliance work under the FRB

6   orders was "off track" and that "resource constraints" continued "across all efforts." WFAS also

7   warned the RCOC regarding progress under the OCC and CFPB orders, which was still rated as "at

8   risk."[188]    The RCOC remained focus on the FRB work, with meetings scheduled between

9   management and FRB officials upcoming.

10   148.    On April 30, 2019, Wells Fargo submitted a revised Comprehensive Action Plan to

11   establish a company-wide consumer complaints platform, as required under the 2016 OCC Order.[189]

12   The revised plan contemplated an extended deadline for implementation and validation of the

13   platform until September 30, 2021.[190]    The OCC warned Wells Fargo that "this completion is now

14   five years beyond the execution of the [2016 Consent Order] and any additional extension requests

15   may potentially subject the bank to additional enforcement actions or penalties."[191]

16   149.    On May 28, 2019, WFAS completed a report on the 2018 OCC Order, rating Wells

17   Fargo's status under the order as "yellow" or "at-risk." WFAS noted issues with the Company's

18   remediation plan and CRMP, and noted that Wells Fargo failed three recent milestones related to root

19   cause analysis. Also on May 28, 2019, WFAS reported to the RCOC that "resource constraints"

20   continued "across all efforts" under the 2018 FRB Order.

21   150.    In July 2019, the OCC again expressed its frustration with the Company's compliance,

22   noting "minimal change" since March 2019.[192]    The OCC reported that "a large number of plans had

23   to be resubmitted multiple times" and that "the OCC remains concerned about the overarching vision

24   around remediation."[193]    The OCC also met with the Board and advised the directors that they must

25

26   [188] Id.
    [189] Majority Report at 32.
    [190] Id.
27   [191] Id. at 32-33.
    [192] Majority Report at 65.
28   [193] Id. at 64.

"meet their commitments" and "develop a track record of success against your regulatory commitments."[194]

151.    That same month, WFAS reported to the RCOC that "Wells Fargo is not addressing multiple critical issues and is not on track to meet regulator expectations or our corporate goal for risk management."  WFAS also warned that the CRMP under the OCC and CFPB orders was off-track and that customer remediation was at-risk.

152.    Days later, during Board meetings, directors discussed "matters relating to missed deadlines" and "failed validations" and C. Allen Parker, a Board member, "commented on the importance of frequent and transparent engagement with the regulators regarding the status of remediation activities."

153.    Nevertheless, in November 2019, WFAS again warned the RCOC that "Wells Fargo is not on track to meet regulator expectations."  WFAS noted that 29 of 56 "milestones" for the Compliance Plan under the OCC & CFPB orders were "off-track," with only 15 having been fully validated and ready for regulator review.  10 others were "on track" and two had not yet been rated.

154.    In December 2019, the RCOC met and discussed the fact that most workstreams were "off-track."  That same month, the CFPB again objected to Wells Fargo's latest submission "for material deficiencies."[195]

155.    In January 2020, Internal Audit continued to warn the RCOC regarding the "high number of milestones . . . currently off track" under the OCC and CFPB orders.

156.    In late January 2020, Wells Fargo's COO Scott Powell warned the Board that the Company's "regulatory issues are symptoms of core issues that need to be addressed by implementing the Company's risk management framework and operating the Company differently and in alignment with heightened regulatory standards."  A month later, management reported to the Board that "there was not a significant change in the Company's regulatory progress in January."

157.    As of February 24, 2020, WF Bank had submitted its remediation plan to the CFPB four times, most recently on January 31, 2020, and its compliance plan three times, most recently on

---

[194] Republican Report at 74.
[195] Republican Report at 73.

April 30, 2019, and had yet to submit a satisfactory plan.[196]  The CFPB's Western regional director also indicated that Wells Fargo's repeated submission of unacceptable plans was "unusual" in comparison to other banks.[197]  More than four years after the 2016 CFPB Order, the CFPB had not approved the Bank's remediation or compliance plans.[198]  Under the 2016 CFPB Order, all of the deficient plans had required Board approval prior to submission.

158.    Further, as of March 2020, WF Bank estimated that it would not achieve full compliance with the 2016 OCC Order until September 30, 2021, and had not even provided an estimated date for when it would be fully compliant with the 2018 OCC Order.[199]  Nor had Wells Fargo submitted a written plan that the Federal Reserve considered acceptable.[200]

### 4.    Wells Fargo Settles Potential Criminal Charges With The SEC And Department Of Justice By Agreeing To Pay $3 Billion

159.    On February 21, 2020, the DOJ announced that Wells Fargo had "agreed to pay $3 billion to resolve their potential criminal and civil liability stemming from a practice between 2002 and 2016 of pressuring employees to meet unrealistic sales goals that led thousands of employees to provide millions of accounts or products to customers under false pretenses or without consent, often by creating false records or misusing customers' identities . . . ."[201]

160.    One of the offices bringing the case, the U.S. Attorney for the Western District of North Carolina, stated:

> This case illustrates a complete failure of leadership at multiple levels within the Bank. Simply put, Wells Fargo traded its hard-earned reputation for short-term profits, and harmed untold numbers of customers along the way. . . . We are hopeful that this $3 billion penalty, along with the personnel and structural changes at the Bank, will ensure that such conduct will not reoccur.[202]

---

[196] Majority Report at 36.
[197] *Id.*
[198] *Id.*
[199] *Id.* at 36.
[200] Republican Report at 57.
[201] Press Release, DOJ, *Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices Involving the Opening of Millions of Accounts without Customer Authorization* (Feb. 21, 2020), https://www.justice.gov/opa/pr/wells-fargo-agrees-pay-3-billion-resolve-criminal-and-civil-investigations-sales-practices.
[202] *Id.*

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1   161.    The SEC also settled its charges against Wells Fargo at the same time under the terms

2   announced by the DOJ.[203]

3          **5.    In March 2020, The House Financial Services Committee Releases Two
               Damning Reports About Wells Fargo's Noncompliance With Existing
4              Consent Orders**

5   162.    In February 2019, Rep. Maxine Waters, Chairwoman of the House Committee on

6   Financial Services:

7          initiated an investigation to (1) determine and evaluate the non-public actions
           taken by Wells Fargo's board, management, and regulators to facilitate
8          improvements at Wells Fargo; and (2) identify policy solutions to ensure
           consumers are protected from recidivist megabanks like Wells Fargo.[204]

9

10  163.    Thereafter, in April 2019, Chairwoman Waters and Representative Al Green,

11  Chairman of the Subcommittee on Oversight and Investigations, sent document requests to current

    and former Wells Fargo Board members.[205]    The Committee held numerous interviews with
12
    regulators and Wells Fargo Board members and executives over the ensuing year, and in many cases
13
    heard testimony from key persons.
14

15  164.    In March 2020, the House Committee released its two reports regarding Wells Fargo

16  and the Board's inadequate compliance with the Consent Orders.  The reports found that the Board

17  "failed to hold management accountable" and "continued to support management despite warnings

    that the consent order compliance program was inadequate."[206]  And despite regulators' "constant
18
    communication" with Wells Fargo, "the bank lacked the talent and infrastructure to create plans to
19
    comply with the consent order[s]."[207]
20

21  165.    The Republican Report details at length how "Wells Fargo failed to adopt even the

22  most common industry practices in risk management and protocols."[208]  The report also details how

23  Wells Fargo failed to comply with the 2016 Consent Orders and the 2018 Consent Orders, in part by

24

25  _____

    [203] Press Release, SEC, *Wells Fargo to Pay $500 Million for Misleading Investors About the Success
26  of Its Largest Business Unit* (Feb. 21, 2020), https://www.sec.gov/news/press-release/2020-38.
    [204] Majority Report at 4.
27  [205] *Id.* at 8.
    [206] Republican Report at 2.
    [207] *Id.* at 74.
28  [208] *Id.* at 1.

1   frequently submitting to regulators "a plan for a plan."[209]  The evidence showed that "the Board

2   continued to support management despite warnings that the consent order compliance program was

3   inadequate."[210]

4       166.    The Republican Report traces Wells Fargo's compliance issues back to the 2008

5   financial crisis, which caused most large banks to "recognize[] that management needed visibility

6   throughout the entire firm, to detect and prevent financial and other forms of risk."[211]  But Wells

7   Fargo ignored that trend and "maintained its fragmented model, which relied on 'strong deference'

8   to the leaders of the company's siloed business lines."[212]  The aggressive sales culture at Wells Fargo

9   thus persisted, as the Company lacked a "fully integrated compliance and risk management

10  program."[213]

11      167.    The Republican Report states that "Wells Fargo's inability to implement an enterprise-

12  wide risk management framework is putting the bank's customers at risk."[214]  The Report thus

13  concludes that "Wells Fargo's ongoing inability to address the root causes of widespread sales

14  practice abuses and other consumer-facing scandals are attributable to acute deficiencies in the firm's

15  structure and leadership that made Wells Fargo an outlier among large banks."[215]

16      168.    While regulators consistently and frequently warned Wells Fargo and the Board about

17  its insufficient plans, Board members made themselves unavailable.  For example, then-Chairman

18  Stephen Sanger and Duke were unavailable to meet with regulators in connection with the Board's

19  July 2017 and August 2017 meetings.[216]  Duke even went so far as to insist to the CFPB that she not

20  "receive letters 'asking for a department of the bank to do something,' preferring such letters to go to

21  the specific lines of business."[217]  And in a July 2018 meeting with the regulators, "it became obvious

22

23

---

24  [209] *Id.* at 2.
25  [210] *Id.*
    [211] *Id.* at 3.
26  [212] *Id.* at 3.
    [213] *Id.*
27  [214] *Id.* at 6.
    [215] *Id.* at 5.
28  [216] *Id.* at 84.
    [217] *Id.* at 85.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

-45-

that Duke did not understand how far behind the bank was in complying with the consent orders."[218]
Yet the Board continued to approve of management's "'plan for a plan' approach."[219]

169.    The House Reports detailed that Wells Fargo frequently worked against regulators rather than with them, often "push[ing] back when [Wells Fargo's] plans were rejected" and refusing to take "accountability for the poor quality of their submissions."[220]  The OCC attributed these failings to Wells Fargo's "institutional culture . . . of slow progress."[221]  Simply put, "Wells [Fargo] has no sense of urgency."[222]  And the Board failed to "enforc[e] deadlines on the company's managers."[223]

170.    Put plainly, the House Reports found that Wells Fargo "was grossly mismanaged."[224]

### 6.    Even After Being Excoriated By The Congressional Reports, Wells Fargo's Compliance Shows Little Improvement

171.    Though regulators acknowledged to the House Committee that Wells Fargo's new management seemed more "focused on meeting deadlines and more capable of handling the workload associated with creating a complete plan," progress remained slow as of March 2020.[225]

172.    Wells Fargo continued to struggle to comply with its regulatory obligations well past March 2020, while the Board continued ignoring red flags from its internal auditors that various compliance efforts were "off-track" and/or "at-risk."

173.    On April 23, 2020, Internal Audit reported to the RCOC that the Company's compliance efforts were "off track."  Internal Audit noted that "consistently missed deadlines and strategic changes have impeded progress" under the 2018 FRB Order, while 14 "milestones" under the OCC and CFPB orders were either "at risk" or "off track."

174.    On May 21, 2020, Internal Audit again reported that the Company's efforts were off track.  That same day, the RCOC discussed that "the expected completion dates" for actions required under the 2018 Consent Orders were "uncertain at this time."  Management reported to the RCOC

---

[218] *Id.* at 86.
[219] *Id.*
[220] *Id.* at 74.
[221] *Id.*
[222] *Id.*
[223] *Id.* at 80.
[224] *Id.* at 5.
[225] *Id.* at 79.

1   "three critical issues and . . . a potential delay in the rollout of the complaints management platform,

2   which . . . was a critical deliverable for the [OCC and CFPB] consent orders." The delay in

3   implementation of the complaints management platform threatened to "put the overall expected

4   completion dates at risk."

5       175.   On June 18, 2020, the RCOC discussed management's assessment that the current

6   state of the CRMP "is sustainable and sufficient to drive effective compliance risk management for

7   an organization the size and complexity of Wells Fargo," which Internal Audit had declined to

8   validate.

9       176.   Also on June 18, 2020, Internal Audit reported to the RCOC "a delay in getting

10  approved board meeting minutes," which caused deliverables for the Board Effectiveness plan under

11  the 2018 FRB Order to be past-due. Meanwhile, 10 milestones under the OCC and CFPB orders

12  remained off-track or at-risk.

13      177.   On June 22 and 23, 2020, the Board convened for regularly scheduled meetings.

14  Management informed the Board of "Internal Audit's rejection of certain compliance plan

15  milestones" and the "high number of outstanding remediations." A member of the RCOC reported

16  on the RCOC's May and June 2020 meetings, both of which included numerous red flags of off-track

17  and at-risk workstreams.

18      178.   On December 11, 2020, Internal Audit reported that the CRMP under the 2018 OCC

19  Order remained off-track. That remained the case in March 2021, when Internal Audit also rated the

20  Company's compliance risk management as "weak" overall.

21      179.   Scott Powell, Wells Fargo's Chief Operating Officer, addressed the January 22, 2021

22  RCOC meeting, and informed the Committee about the "CFPB and OCC compliance risk

23  management consent orders" and commented on the continued "off track" status of Wells Fargo's

24  compliance with those orders.

25      180.   In the February 19, 2021 RCOC meeting, Michael Lipsitz, Wells Fargo's Chief

26  Regulatory and Policy Affairs Executive, "discussed the 'off track' status of the consent order issued

27  by the [OCC] regarding compliance risk management, customer remediation, collateral protection

28  insurance, and mortgage interest rate lock extension fees."

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
-47-

181.    As late as March 2021, at a joint meeting of the RCOC and the Risk Committee of the Wells Fargo Board, the Board members were told that compliance with the 2018 FRB Order was still more than two years away.

182.    On April 23, 2021, Wells Fargo's Internal Audit department issued to the RCOC an Internal Audit Regulatory Enforcement Actions Report, which concluded that multiple aspects Wells Fargo's compliance with the OCC's 2018 "Compliance Risk Management Order" were "off-track" or "at risk," including "compensation matters" and "customer remediation plans."    Expected compliance with the order was not projected to occur until March 2023.

183.    The April 23, 2021 report also addressed compliance with the 2018 FRB Order and found that "front line action plans and/or risk acceptance documentation for measures outside of risk appetite" were "off track" and full compliance with the 2018 FRB Order was not expected until the end of 2024.

**7.    Wells Fargo's Board Consciously Disregards A New CFPB Investigation That Begins In 2021**

184.    In 2021, the CFPB notified the Company it was investigating the misconduct in the automobile and mortgage-lending businesses, and the deposit account division.    The investigative demand served as a red flag that the Company was at risk of further regulatory oversight and penalties.

185.    Internal Board documents reflect that in May 2021, the Risk Committee learned that the Company had received "civil investigative demands from the CFPB relating to fraud hold remediation, debit card option remediation, overdrafts, and the auto lending business, with a focus on GAP refunds."    The Risk Committee was reminded of those demands only once again in August 2021.

186.    The full Board was briefed on the CFPB's investigative demands at its June 2021 meeting.    Minutes from the meeting reflect Scott Powell's "regulatory report" to the Board "commented on the status of certain potential CFPB enforcement activity relating to auto, mortgage servicing and deposit matters[.]"

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

187. The Board received similar reports of non-compliance throughout 2021 and 2022. Despite the consistent red flags, Defendants took no meaningful action to prevent further regulatory orders.

188. Between January 2020 and May 2022, the RCOC received four presentations delivered by the head of Wells Fargo Home Lending Servicing. In each of the presentations, "critical findings" regarding the Company's failure to comply with applicable law were reported "open." One such finding concerning incorrect modification decisions arising from, *inter alia*, the improper calculation of attorney fees, was discussed during each of those presentation and only resolved in April 2022. The other "critical findings"—all of which resulted in consumer harm—were the provision of improper mortgage insurance and the Company's failure to adequately implement its own remediation programs.

189. In February 2021, Chief Regulatory and Policy Affairs Executive Michael Lipsitz described the "'off track' status" of Wells Fargo's compliance with the mortgage servicing requirements set forth in the 2018 OCC Consent Order, as well as the related 2018 Federal Reserve Board consent order, to the RCOC. That status was subsequently discussed during a joint meeting of the Risk Committee and the RCOC in March 2021.

190. In April 2021, Mr. Rowe and Head of Customer Remediation Center of Excellence Marc Jarmosevich reported to the Risk Committee that remediation associated with the Company's retail sales practices was "at risk" of falling behind the planned remediation schedule.

191. In August 2021, Mssrs. Rowe and Jarmosevich reported to the Risk Committee that the status of remediation associated with the Company's retail sales practices had changed to "off track" due to the identification of additional customers impacted by the misconduct and the "compressed timeline for Internal Audit to complete validation activities[.]"

192. In October 2021, Mr. Rowe again reported to the Risk Committee that remediation associated with holds placed on customer accounts when fraud indications were detected was "off track" and remediations associated with debit card charge off credits were "at risk."

193. In October 2021, during a Risk Committee meeting, "directors and management discussed certain historical areas of weakness within Home Lending, including the lack of a quality

assurance function, and the current control environment and impact of the [Risk Control Self-Assessment] process." As part of that discussion, Scott Powell commented on in-process improvements to the customer remediation program regarding the identification of affected populations, including relating to the control environment.

194.    On October 25, 2021, as part of the Risk Committee's routine customer remediation update, Head of Enterprise Customer Excellence Andy Rowe informed the Committee that "ineffective control designs and implementation" were responsible for 11 ongoing remediations, including one related to required notices associated with the sale of GAP insurance in New York."

195.    In April 2022, Chief Risk Officer Derek Flowers ("Flowers") and Chief Strategic Enterprise Risk Management Officer Price Sloan reported to the Risk Committee that the overall "control environment" at the Bank for home lending servicing "need[ed] improvement, with weak audit results in compliance and operational risk overall." The results of an "Independent Operational Risk Assessment resulted in high residual risk rating" and the number of open issues regarding operational and compliance risk was trending upward.

196.    In June 2022, Flowers informed the Risk Committee on a May 2022 *Business Insider* article reporting that Wells Fargo had fired loan officers in the Home Lending division as for their improper use of appraisal waivers. The article reported that "dozens" of loan officers had been fired in what was described in the article as "***widespread abuse*** of so-called appraisal waivers among its mortgage staff."[226] Internal Company documents reveal that the Risk Committee heard from Flowers that the Company had conducted a "robust investigation" before terminating the employees, and that the Risk Committee was briefed on the public relations aspect of the report, noting "overall media traffic had been low, although negative in sentiment, and declined relatively quickly." The document does not reflect the Risk Committee considered further investigation or compliance measures as a result of this report.

---

[226] Dakin Campbell, *Wells Fargo Fires Loan Officers Over Alleged Appraisal Waiver Abuse*, Bus. Insider (May 25, 2022), https://www.businessinsider.com/wells-fargo-fires-loan-officers-appraisal-waivers-2022-5 (emphasis added).

197.    In October 2022, the Company's Chief Auditor Paul Ricci informed the Board that the Company's payments processing related to automobile financing "need[ed] improvement[.]" That conclusion was the result of an internal audit that found "[e]xisting issues related to customer communications and transaction processing of less common payment scenarios," as well as "inaccurate payment related communications that may result in a negative impact to customer accounts (e.g., due dates not advancing properly) in specific scenarios, potential inaccurate processing of payoff transactions in particular instances (i.e., if final payment due date falls on Sunday or holiday, payoffs with an effective date prior to effective date of a posted payment), and debit accounts not being validated prior to first use as required by National Automated Clearing House Association operating rules. One Audit-sourced Moderate risk issue was identified related to the lack of proper entitlement management and access for multiple payment related applications."

198.    In October 2022, three months before the CFPB Consent Order, Flowers reported to the Board that the Company had lost $17 million as a result of Wells Fargo's Community Mortgage division incorrectly processing realized loss on specialty loans.

### G.    Wells Fargo's Continued Regulatory Failures Cause Two New Consent Orders To Be Issued By The OCC, Including A Fine Of $250 Million.

199.    Wells Fargo's inability or unwillingness to comply with its obligations under the 2018 Consent Orders took its predictable toll.  On September 9, 2021, the OCC issued two new consent orders against Wells Fargo for its failure to "fully and timely" satisfy the 2018 OCC Order. Specifically, the OCC identified "material deficiencies regarding the Bank's [mortgage foreclosure] loss mitigation activities, including loan modification decisions and operational practices, and inadequate Independent Risk Management and Internal Audit of the Bank's loss mitigation activities and . . . violations of the 2018 [OCC] Consent Order."[227]  The OCC issued a $250 million civil penalty against Wells Fargo and "put[] limits on the bank's future activities until existing problems in mortgage servicing are adequately addressed."[228]

---

[227] 2021 OCC Orders at 1.
[228] News Release 2021-95, OCC, *OCC Assesses $250 Million Civil Money Penalty, Issues Cease and Desist Order Against Wells Fargo* (Sept. 9, 2021).

200.    In announcing the 2021 OCC Consent Order, Acting Comptroller of the Currency Michael J. Hsu said: "Wells Fargo has not met the requirements of the OCC's 2018 action against the bank. This is unacceptable."[229]  That Consent Order had findings from the Comptroller that said: "The Bank has significant deficiencies related to its loss mitigation activities" and "while the Bank has taken steps to comply with the 2018 Order and is committed to addressing the remaining requirements in the Order, the Bank has failed to fully and timely implement effective and sustainable corrective actions required by the Order related to enterprise-wide compliance risk management and customer remediation and is thereby in violation of the 2018 Order."[230]

### H.    The CFPB Imposes A Massive $3.7 Billion Fine And Restitution Requirement Against Wells Fargo, The Largest In The CFPB's History

201.    On December 20, 2022, the CFPB issued a new consent order against WF Bank and ordered Wells Fargo to pay *$3.7 billion* for multiple violations of the CFPA in connection with "widespread mismanagement of auto loans, mortgages, and deposit accounts,"[231] including misconduct that occurred through 2022, well after Wells Fargo and the Bank were already subject to multiple Consent Orders and other legal and regulatory penalties for previous violations of federal law. The CFPB's specific findings include:

202.    Automobile Loan Servicing Acts and Practices:

a.    From at least 2011 through 2022, Wells Fargo incorrectly applied borrowers' payments; charged borrowers inappropriate fees, interest, or other amounts; and improperly repossessed borrowers' vehicles.  In addition, Wells Fargo did not have sufficient processes to ensure that borrowers who previously paid certain fees upfront to automobile dealers received a refund of

---

[229] Press Release, OCC, *OCC Assesses $250 Million Civil Money Penalty, Issues Cease and Desist Order Against Wells Fargo* (Sept. 9, 2021), https://www.ots.treas.gov/news-issuances/news-releases/2021/nr-occ-2021-95.html.

[230] 2018 OCC Consent Order at Art. II.

[231] Press Release, CFPB, *CFPB Orders Wells Fargo to Pay $3.7 Billion for Widespread Mismanagement of Auto Loans, Mortgages, Deposit Accounts* (Dec. 20, 2022).  Much of the remediation amount previously had been paid out by Wells Fargo, including $1.3 billion in connection with auto loans.  Nonetheless, it took a $2 billion charge in the third quarter of 2022, and an expected operating loss of $3.5 billion in the fourth quarter.  Ben Eisen, *Wells Fargo to Pay Record CFPB Fine to Settle Allegations It Harmed Customers*, Wall Street Journal (Dec. 20, 2022, 4:22 PM), https://www.wsj.com/articles/wells-fargo-reaches-3-7-billion-deal-with-regulators-over-consumer-banking-11671546132.

those fees when warranted. As part of the 2022 CFPB Order, the CFPB ordered Wells Fargo to pay $1.3 billion in remediation to over 11 million borrower accounts to address that misconduct.[232]

b.    The 2022 CFPB Order details the myriad ways in which Wells Fargo's automobile loan servicing acts and practices failed to comply with applicable law for years on end. For example, it states that from "November 2012 until at least August 2018, if a borrower requested that a payment be applied to principal, branch employees were unable to notify borrowers about past due amounts that a principal-only payment would not cover because [Wells Fargo] did not make the information accessible to branch employees, resulting in nearly 210,000 borrower accounts for which payments were applied in a manner that was less beneficial to the borrower than they could have been."[233]  The cost to remediate that failure was $105 million, not including the civil penalty to the CFPB.

c.    Wells Fargo also harmed almost six million borrower accounts by failing to "apply certain borrower payments in the manner described on [Wells Fargo's] website; to post certain borrower payments in a timely fashion; or to ensure that certain automatic payment amounts reflected the amount owed and due; among other payment-application errors that harmed customers."[234]  The CFPB ordered Wells Fargo to pay $565 million in remediation as a result.

d.    Wells Fargo additionally suffered from "technology, audit, and compliance failures" that led it to assess auto borrowers "erroneous feels and interest."[235]  For example, "from at least 2011 until at least March 2019, [Wells Fargo] sometimes incorrectly entered the effective date of a payment deferment in, or omitted it from, its servicing system-of-record" resulting in harms to 688,000 borrower accounts totaling $26.5 million.  Other, similar failures to "almost 4.5 million borrower accounts" led to the Company paying $424 million in remediation.[236]

e.    Next, from "*at least 2011 through 2022*," Wells Fargo experienced other "servicing errors" which led to the Company improperly repossessing borrowers' automobiles.[237]

---

[232] *Id.* ¶¶ 7-22.
[233] *Id.* ¶ 9.
[234] *Id.* ¶¶ 10-11.
[235] *Id.* ¶ 12.
[236] *Id.* ¶¶ 12-13.
[237] *Id.* ¶ 14 (emphasis added).

"For example, [Wells Fargo] repossessed vehicles despite the borrower having made a payment or entering into an agreement to forestall the possession."[238] Wells Fargo also failed to "sell a repossessed vehicle in a commercially reasonable amount of time" at least 38,000 times, resulting in $40 million in remediation to customers. Altogether, Wells Fargo had to pay more than $246 million to remediate repossession-related harms to nearly 850,000 borrowers.[239]

        f.      Wells Fargo failed to properly refund automobile borrowers who purchased GAP, a debt cancellation contract that relieves the borrower of their obligation to pay the remaining amount of their loan on a vehicle above the vehicle's depreciated value in the case of a major accident or theft. When borrowers paid the loan off early, they were entitled to a refund of the unearned portion of their GAP fee that they paid upfront when purchasing their vehicle. But Wells Fargo failed to provide its borrowers with these refunds and "*until July 2021*, [Wells Fargo] did not ensure that, for the loans it did not originate but subsequently owned and serviced, borrowers received the refund for which they were eligible.[240] Wells Fargo paid refunds of "tens of millions of dollars" to remediate this issue.[241]

    203.    Home Mortgage Servicing Acts and Practices:

        a.      At various points between 2013 and 2018, Wells Fargo incorrectly denied mortgage loan modification applications and miscalculated fees and other charges for thousands of mortgage borrowers, resulting in at least $195 million in remediation payments. As the CFPB noted, some of these failures were the result of software errors that persisted over multiple years.[242]

        b.      For example, from "at least 2011 through April 2018," Wells Fargo's process for "evaluating loan-modification applications" overstated the attorneys' fees that borrowers owed and sometimes caused "an otherwise qualified borrower not to be offered a loan modification."[243] Wells Fargo only learned of this issue after more than two years in "late 2013" and concluded, incorrectly, that the issue "did not adversely affect borrowers' ability to obtain loan modifications."

---

[238] *Id.*
[239] *Id.* ¶¶ 15-16.
[240] *Id.* ¶¶ 17-18 (emphasis added).
[241] *Id.* ¶ 18.
[242] *Id.* ¶¶ 23–30.
[243] *Id.* ¶ 24.

Wells Fargo attempted to fix the calculation, but, **nearly five years later in March 2018**, it determined that it "had not fixed the issue and was continuing to fail to offer some borrowers loan modifications."[244]   Ultimately, it cost Wells Fargo approximately $77.2 million to remediate the issue.[245]   The 2022 CFPB Order also listed a litany of failures of mortgage servicing, including erroneously identifying borrowers with Government Sponsored Entity loans as deceased, assessing "unwarranted charges and fees" when certain customer paid off a mortgage that was the subject of a foreclosure judgment, Wells Fargo failed to timely pay the appropriate amount of property taxes, Wells Fargo miscalculated the interest rate on certain adjustable rate mortgages after a loan modification ended, and Wells Fargo did not give certain customers "complete information about their ability to stop paying for expensive private mortgage insurance."[246]

204.    Consumer Deposit Account Acts and Practices:

a.    The 2022 CFPB Order detailed that from "at least 2011 through October 2016," Wells Fargo would improperly freeze a customer's entire deposit account, and other accounts, when there was any fraud detected through Wells Fargo's system.   "This account freeze prevented the customer from accessing any funds in the account, not just the funds from the suspect deposit" and customers were unable to access their money for an average period of "at least two weeks."[247]

b.    These practices cost the company "over $160 million in remediation" to more than one million deposit account customers.[248]

c.    Wells Fargo also manipulated how it counted debit card purchases each month to avoid waiving "monthly service fees (MSFs), usually $10 or $12" that it charged to customers with deposit accounts.   From "April 2012 to November 2020," customers that made "'10 or more debit card purchases and/or payments from this checking account' during the monthly statement cycle" were entitled to a waiver of the MSFs.[249]   However, Wells Fargo only counted debit card transactions, rather than all types of payments, towards the ten transactions and only those that posted during the

---

[244] *Id.* ¶ 25.
[245] *Id.*
[246] *Id.* ¶¶ 26-27.
[247] *Id.* ¶¶ 31-32.
[248] *Id.* ¶ 33.
[249] *Id.* ¶ 38.

statement cycle (despite debit card transactions sometimes posting several days after the purchase).[250] These practices harmed more than four million account holders and Wells Fargo paid $141 million in remediation to customers.

        d.        Wells Fargo sometimes assessed fees on overdrafts on consumer debit card purchases and ATM withdrawals based on when the transaction *settled* even if the customer had sufficient funds available *at the time they made the transaction*. In the words of the CFPB, "these Authorized-Positive Overdraft Fees were not reasonably avoidable because they were contrary to consumers' reasonable expectations."[251] Only in March 2022 did Wells Fargo "implement[] a process to stop charging" these fees.[252]

    205.    The CFPB required Wells Fargo to pay $2 billion in restitution to more than 16 million consumers and a $1.7 billion civil penalty, the largest ever assessed by the CFPB. Of the $2 billion in restitution, $1.3 billion will go to consumers with affected auto lending accounts, $500 million to those with affected deposit accounts and nearly $200 million to those whose mortgage loans were affected.[253]

    206.    In announcing the 2022 CFPB Order, Rohit Chopra, the CFPB Director, characterized Wells Fargo as a "repeat offender" and said the Company's "rinse-repeat cycle of violating the law has harmed millions of American families."[254] News reporting on the 2022 CFPB Order noted that Wells Fargo was now subject to a total of ***nine*** open consent orders.[255]

## I.    The Wells Fargo Board Consciously Disregards The Massive $3.7 Billion Fine And Restitution Requirement.

    207.    Management briefed the Board on the CFPB investigation at its December 13, 2022 Board meeting, just days before it was announced. According to internal documents, CEO Scharf

---

[250] *Id.* ¶ 39.
[251] *Id.* ¶¶ 43-44.
[252] *Id.* ¶ 44.
[253] *Id.*
[254] Press Release, CFPB, *Prepared Remarks of CFPB Director Rohit Chopra on the Wells Fargo Law Enforcement Action* (Dec. 20, 2022), https://www.consumerfinance.gov/about-us/newsroom/prepared-remarks-of-cfpb-director-rohit-chopra-on-the-wells-fargo-law-enforcement-action/.
[255] Hugh Son, *Wells Fargo agrees to $3.7 billion settlement with CFPB over consumer abuses*, CNBC (Dec. 12, 2022), https://www.cnbc.com/2022/12/20/wells-fargo-agrees-to-3point7-billion-settlement-with-cfpb-over-consumer-abuses.html.

briefed the Board on "how he expect[ed] to address the [CFPB Consent Order] in the Company's first quarter earnings call."

208.    The Board and the Company's officers were focused on the public relations impact of the announcement. CFO Santomassimo "described the communications process" regarding the Consent Order, "noting that he [would] be updating [the Board] on the financial impact of the proposed resolution." Additionally, "[i]n response to a question from a director, Mr. Scharf commented on the reaction to the proposed resolution from other regulators, and also noted his expectations regarding the broader public reaction."

209.    The December 13, 2022 meeting minutes do not reflect any discussion by the Board of the underlying misconduct raised by the 2022 CFPB Order. The Board also did not discuss how the Company planned to ensure compliance with this new consent order.

210.    On December 19, 2022, the day before the CFPB's announcement, the Wells Fargo Board held a joint special meeting with the Wells Fargo Bank N.A. Board about the 2022 CFPB Order. During that meeting, Wells Fargo General Counsel Ellen Patterson provided an overview of "the final terms of the proposed" consent order (including the $3.7 billion the Company would pay in penalties and remediation to customers). The Boards adopted a resolution—signed by Executive Vice President Tangela Richter and Defendant Black, the Chair of the Board—authorizing execution of the 2022 CFPB Order.

211.    At the same meeting, the Wells Fargo Bank Board immediately delegated oversight of compliance with the 2022 CFPB Order to the RCOC, the same committee that had been charged with—and overtly failed at—ensuring compliance with the other regulatory consent orders.

212.    As with the December 13 meeting, the December 19, 2022 Board minutes do not reflect any discussion among the Board of the misconduct underlying the 2022 CFPB Order. Nor was there any discussion about how the Company planned to ensure compliance with the 2022 CFPB Order, or instruction to the RCOC about such matters.

**J.      Wells Fargo Agrees to Pay $1 Billion to Settle Class Action Over Compliance with the OCC Consent Order**

213.    On May 15, 2023, Wells Fargo agreed to pay $1 billion to settle a securities fraud suit brought against it by its shareholders alleging misstatements regarding the Company's compliance with the 2018 OCC Order.  *See In re Wells Fargo & Company Securities Litigation*, Case No. 1:20-cv-04494-GHW-SN.  The United States District Court for the Southern District of New York granted final approval of the $1 billion settlement on September 8, 2023.

**V.      DEMAND IS FUTILE**

214.    Plaintiff brings this Action derivatively in the right and for the benefit of the Company to redress breaches of fiduciary duty by the Individual Defendants.

215.    Plaintiff will adequately and fairly represent the interests of Wells Fargo and its shareholders in enforcing and prosecuting this type of action.

216.    As of May 2023, the Board consisted of the following thirteen directors: Defendants Black, Chancy, Craver, Morris, Payne, Sargent, Scharf, and Vautrinot, and directors Celeste A. Clark, Richard K. Davis, Wayne M. Hewett, CeCelia G. Morken, and Felicia F. Norwood.

217.    Plaintiff did not make a demand on the Board in this case because, under well-settled and controlling Delaware law, the decision in *Timothy Himstreet, et al. v. Charles W. Scharf, et al.*, No. CGC-22-599223 (Cal. Super. Ct. Oct. 5, 2022), which found that demand was excused based on particularized allegations substantially similar to those herein, is binding upon any subsequent court evaluating whether demand is excused.

218.    Plaintiff also did not make a demand on the Board prior to initiating this action because such a demand would have been a futile, wasteful, and useless act in that a majority of the Board would have been "interested" in (and therefore conflicted from and unable to fairly consider) a demand because they each face a substantial likelihood of liability for their respective roles in Wells Fargo's misconduct detailed herein.

219.    The Board knowingly and consciously presided over the Company's systemic violations of the 2018 Consent Orders and other federal laws and failed to make a good faith effort to ensure compliance as required by the consent orders, federal law, and Delaware law.  A majority

1  of the Board, including the Individual Defendants, served as directors during some or all of the

2  wrongdoing alleged herein, and each of the Defendants knew of the wrongdoing and the required

3  remediation but failed to act in the face of a known duty to act.

4       220.    The sustained and systematic failure of the Board to ensure compliance with the law

5  was a result of the directors' knowing breaches of or reckless disregard for their fiduciary duties.

6  Despite being aware of the Company's prior misconduct concerning risk management, the

7  Defendants failed to take appropriate remedial actions, including actions specifically required by the

8  Company's regulators and federal law, and that failure to take action resulted in substantial corporate

9  losses.

10       221.    As alleged herein and based on the duties imposed pursuant to the 2018 Consent

11  Orders and federal law, the Individual Defendants were aware of indicators and warnings that

12  necessarily informed them of the legal and regulatory violations taking place within the Company.

13  Notwithstanding these warnings, the Individual Defendants wholly failed to provide oversight for

14  years.  Accordingly, demand is excused.

15  **CLAIMS FOR RELIEF**

16  **COUNT I**

17  **(Against The Individual Defendants For Breach Of Fiduciary Duty)**

18       222.    Plaintiff repeats and re-alleges all the preceding allegations as if fully set forth herein.

19       223.    The Individual Defendants, as Wells Fargo directors, owed Wells Fargo the utmost

20  fiduciary duties of care and loyalty.  By virtue of their positions as directors and/or officers of Wells

21  Fargo, and of their exercise of control over the business affairs of the Company, the Individual

22  Defendants had the power to control and influence and did control and influence or cause the

23  Company to engage in the misconduct complained of herein.

24       224.    As described above, the Individual Defendants breached their fiduciary duties by

25  knowingly and deliberately failing to adequately oversee Wells Fargo's progress towards satisfaction

26  of the Consent Orders and other federal laws or to mitigate the years-long failures, ultimately resulting

27  in new enforcement actions and fines, as well as reputational damage.

28

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

225. As a result of the foregoing, Wells Fargo has been harmed, and has no adequate remedy at law.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment as follows:

A. Finding that demand on the Wells Fargo Board is excused as futile;

B. Finding that the Individual Defendants breached their fiduciary duties of loyalty and care to the Company;

C. Awarding appropriate damages and equitable relief to remedy the Individual Defendants' breaches of fiduciary duty to the Company;

D. Awarding pre- and post- judgment interest on any monetary award;

E. Awarding Plaintiff its reasonable attorneys' fees, expenses, and costs; and

F. Granting such other and further relief as the Court deems just and equitable.

## VII. JURY DEMAND

Plaintiff demands trial by jury.

Dated: February 16, 2024

KESSLER TOPAZ
MELTZER & CHECK, LLP

*/s/ Eric L. Zagar*
Eric L. Zagar  (Bar No. 250519)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Lead Counsel for Lead Plaintiff City of Hollywood Firefighters' Pension System*

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
Richard M. Heimann (063607)
*rheimann@lchb.com*
Katherine Lubin Benson (259826)
*kbenson@lchb.com*
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Additional Counsel for Plaintiff*

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
-60-

## VERIFICATION

I, Jason A. Rosner, Chairman of City of Hollywood Firefighters' Pension System, verify that I have reviewed the foregoing Verified Consolidated Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15th day of February, 2024.

Jason A. Rosner,
Chairman, City of Hollywood Firefighters'
Pension System